No objections to this Report and Recommendation (the "R&R") have been filed, so I review it for clear error, and find none.  Accordingly, the R&R is adopted as the decision of the Court.  Plaintiff's motion for judgment on the pleadings is denied, and Defendant's cross-motion for judgment on the pleadings is granted.  The Clerk of Court is respectfully directed to terminate Docs. 13 and 15, enter judgment for Defendant, and close the case.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------

MARIA VILLALOBO,

SO ORDERED.

*Cathy Seibel*

CATHY SEIBEL, U.S.D.J.

Plaint

2/25/21

**REPORT AND
RECOMMENDATION**

-against-

ANDREW M. SAUL,
Commissioner of Social Security,

19 Civ. 11560 (CS)(JCM)

Defendant.

-----------------------------------------------------------------X

To the Honorable Cathy Seibel, United States District Judge:

Plaintiff Maria Villalobo ("Plaintiff") commenced this action pursuant to 42 U.S.C. §

405(g), challenging the decision of the Commissioner of Social Security (the "Commissioner"),

which denied Plaintiff's application for disability insurance benefits and supplemental security

income ("SSI"), finding her not disabled within the meaning of the Social Security Act (the

"Act"). (Docket No. 1).  Presently before this Court are (1) Plaintiff's motion for judgment on

the pleadings pursuant to Federal Rule of Civil Procedure 12(c), (Docket No. 13), and (2) the

Commissioner's cross-motion for judgment on the pleadings, (Docket No. 15).  For the reasons

set forth herein, the Court respectfully recommends denying Plaintiff's motion for judgment on

the pleadings and granting the Commissioner's cross-motion.

## I.  BACKGROUND

Plaintiff was born on January 22, 1965. (R.[1] 56).  On May 5, 2016, Plaintiff applied for

supplemental security income and disability insurance benefits, alleging that she was disabled

---

[1] Refers to the certified administrative record of proceedings relating to Plaintiff's application for social security benefits, filed in this action on May 21, 2020. (Docket No. 12).  All page number citations to the certified administrative record refer to the page number assigned by the SSA.

beginning January 1, 2015. (R. 10, 90-91, 264-80).  The Social Security Administration ("SSA")

denied Plaintiff's claims on June 28, 2016 and Plaintiff requested a hearing before an

administrative law judge ("ALJ"). (R. 10, 100).  Plaintiff appeared before ALJ Andrea Addison

on December 3, 2018. (R. 10).  At the hearing, Plaintiff requested to amend her alleged disability

onset date to October 1, 2017. (R. 44-45).  On January 15, 2019, the ALJ issued a decision

finding that Plaintiff was not disabled and therefore not entitled to supplemental security income

or disability insurance benefits. (R. 10-21).  The Appeals Council subsequently denied Plaintiff's

request for review on October 18, 2019, and the decision of the ALJ became the Commissioner's

final decision. (R. 1-6).

## A.  Medical Evidence

As summarized below, the administrative record reflects medical treatment Plaintiff

received from multiple sources, for physical, psychiatric and cognitive impairments.[2]

## 1.  Medical Evidence Relating to Plaintiff's Physical Conditions

## i.  CCN General Medical PLLC ("UCCN")

## (a)  Before the Alleged Disability Onset Date

At an appointment on July 14, 2017 with Dr. Cecilia Calderon, her primary care

physician, Plaintiff complained of "finger problems" in her "left hand." (R. 633).[3]  Plaintiff

reported pain on a scale of "4/10" but was not in acute distress. (*Id.*)  On examination, she

demonstrated normal range of motion in all joints, and no clubbing, cyanosis or edema in her

extremities. (*Id.*).  Dr. Calderon diagnosed neuralgia and neuritis, unspecified, (*id.*), and

---

[2] Plaintiff does not challenge the ALJ's decision or findings with respect to her hypertension. (*See generally* Docket No. 14; R. 13). Accordingly, the Court's summary of the medical evidence focuses primarily on Plaintiff's treatment for her left wrist fracture, as well as her mental health treatment.

[3] The record contains duplicate versions of multiple medical treatment notes. (*See, e.g.*, R. 384, 633; 390, 639).  For ease of reference, the Court will cite only one version of the duplicative notes.

prescribed gabapentin, (R. 634).  Plaintiff returned on July 31, 2017, stating that the gabapentin

was "not helping" and that there had been pain in the tip of her left finders for the past few

weeks. (R. 636).  However, she reported "zero" on an overall pain scale. (*Id.*).  Dr. Calderon

prescribed naproxen in addition to the gabapentin. (*Id.*).  The following month, August 14, 2017,

Plaintiff did not complain of any left finger pain. (R. 639).  However, she reported little pleasure

or interest in doing things, as well as feeling down, depressed or hopeless. (*Id.*).

**(b) After the Alleged Disability Onset Date**

Plaintiff visited Dr. Calderon on December 20, 2017, reporting that a police officer had

"pushed" her the day before, hurting her left arm. (R. 645).  Plaintiff complained of pain at a

scale of "5/10." (*Id.*).  On examination, Dr. Calderon noted mild swelling and erythema to the

left forearm and wrist area, as well as limited range of motion "secondary to pain." (*Id.*).  She

diagnosed "acute pain of [the] left wrist," prescribed additional naproxen and ordered X-rays of

Plaintiff's left wrist and forearm. (*Id.*).  An X-ray assessment from December 26, 2017

demonstrated buckling of the lateral cortex of Plaintiff's left wrist and distal metaphysis of the

radius without a radiolucent fracture line. (R. 683).  There was also evidence of soft tissue

swelling, but no abnormal intercarpal spacing or alignment. (*Id.*).  Dr. Kenneth Richman, a

radiologist, opined that Plaintiff had a distal radius fracture. (*Id.*).  Two days later on December

28, 2017, Plaintiff reported a pain scale of "4/10," but on examination showed no more swelling

or deformities and no acute distress. (R. 647).  Dr. Calderon prescribed a splint wrist brace,

referred Plaintiff to an orthopedic surgeon, and directed her to continue taking naproxen. (R.

647-48).

By February 15, 2018, although Plaintiff gave positive responses to the depression

screening questions, she reported "zero" pain and she continued to present normally on

examination, with no swelling or deformities. (R. 651).   A musculoskeletal examination on

November 16, 2018 revealed "no muscle or joint pain, . . . no swelling or redness in joints, no limitation in motion, [and] no muscle weakness." (R. 655).  Dr. Calderon directed her to stop taking naproxen, acetaminophen and gabapentin. (*Id.*).

### ii. BronxCare Health System

Plaintiff received an orthopedic evaluation by Dr. Ashok Dubey for her left wrist pain on February 12, 2018. (R. 436, 440).  She reported being assaulted by a police officer on December 3, 2017,[4] and that she was told by an "outside clinic" that she had a tiny left wrist fracture. (R. 440).  Plaintiff reported pain on a scale of "4/10." (*Id.*).  On examination, Dr. Dubey observed intact radial, median and ulnar nerves as well as finger and thumb flexion and extension. (*Id.*).  However, there was some tenderness along the dorsal aspect of Plaintiff's left wrist, as well as swelling and pain with wrist flexion and extension. (*Id.*).  Plaintiff could flex and extend her wrist to approximately thirty degrees. (*Id.*).

Dr. Dubey diagnosed a wrist fracture and wrist pain, recommending occupational therapy and a brace, with a follow-up and further X-rays in four to five weeks. (R. 441).  He noted that Plaintiff reported "minimal pain," but that she may have some "permanent pain, stiffness and arthritis as a result of this injury." (*Id.*).

As planned, Plaintiff received an X-ray assessment of her left wrist by Dr. Christine Nicoleau on February 12, 2018. (R. 454-55; 512).  Dr. Nicoleau opined that Plaintiff's left wrist demonstrated "marked" decreased bone mineral density out of proportion with Plaintiff's age. (*Id.*).  She also observed a possibly "degenerative" faintly sclerotic line in the distal radius, which could be "part of" diffuse heterogeneous bone mineral density, or due to a nondisplaced

---

[4] The treatment notes list the date of the incident as December 3, 2018, but this appears to be a typographical error. (R. 440).

fracture. (R. 455, 512). Plaintiff's wrist maintained carpal alignment but showed joint space narrowing. (*Id.*).

On February 28, 2018, Plaintiff had an initial appointment with Occupational Therapist ("OTA") Kevin Haynes. (R. 443). OTA Haynes described Plaintiff's wrist as "50%" weight bearing, but Plaintiff reported "severe" pain on a scale of "7/10" without movement. (R. 445-46). Plaintiff explained that it was "difficult" to engage in activities of daily living independently due to "severe pain" and she required "constant help from her daughter." (R. 446). On examination, Plaintiff received a Disabilities of the Arm, Shoulder and Hand ("DASH") score of 70 out of 100, indicating a "moderate level of deficiency" in activities of daily living. (*Id.*). Her left wrist could only flex thirty degrees and extend fifty-five degrees, whereas her right wrist could flex sixty-five degrees and extend seventy degrees. (R. 447). Similarly, she could only grip twenty pounds with her left hand, as opposed to sixty pounds with her right hand. (R. 446). However, a manual muscle test ("MMT") showed identical results in the left and right wrists. (*Id.*).

On March 28, 2018, Plaintiff received another X-ray assessment from Dr. Harvey Stern. (R. 513). Dr. Stern observed intact overlying soft issues and a sclerotic area in the distal radius most likely representing an "old healed fracture." (*Id.*). He did not observe any "other bone or joint space abnormality" or detect any further changes since the February 12th X-ray. (*Id.*).

That same day, Plaintiff returned to Dr. Dubey for a follow-up, reporting pain at a level of "3/10." (R. 454). On examination, Dr. Dubey noted minimal dorsal left wrist tenderness, extension and flexion up to forty degrees, and soft compartments. (*Id.*). There was no block to pronation or supination. (*Id.*). The rest of the examination was normal. (*Id.*). Dr. Dubey removed wrist pain from Plaintiff's list of active issues. (R. 455). He continued to recommend

physical therapy and reiterated to Plaintiff that the fracture's resulting stiffness and loss of motion may be permanent. (*Id.*).  He also prescribed Tylenol for pain management. (*Id.*).

At occupational therapy with OTA Haynes on April 18, 2018, Plaintiff's reported pain decreased to "2/10." (R. 458).  Upon examination, her DASH score had "improved to 50 versus 70 out of 100." (R. 459).  Plaintiff's left grip had increased to "20/25" pounds, and she could now flex her lift wrist "30/40" degrees and extend it "55/60" degrees. (*Id.*).  On May 9, 2018, her pain level increased to "4/10." (R. 471).[5]

At an appointment with Dr. Dubey on May 10, 2018, Plaintiff again reported pain at a scale of "4/10" and that the pain was "worse after therapy." (R. 477).  Plaintiff demonstrated left wrist extension at forty-five degrees and flexion at forty degrees, with soft compartments and some lasting mild dorsal tenderness. (*Id.*).  Dr. Dubey did not detect any swelling or deformity. (*Id.*).  He opined that an X-ray from that day showed that Plaintiff's distal radius fracture had healed with "acceptable alignment." (*Id.*; *see also* R. 515).[6]  Dr. Dubey advised her to discontinue use of the brace to avoid additional stiffness and weakness. (R. 477-78).

On July 12, 2018, Dr. Dubey found no left wrist swelling and "minimal discomfort . . . with deep palpation of the dorsal aspect of the radiocarpal joint." (R. 490).  Plaintiff's wrist now extended to approximately fifty-five degrees and flexed to approximately fifty degrees. (*Id.*).  Plaintiff's reported pain was a "3/10." (*Id.*).  Dr. Dubey demonstrated "basic exercises" and recommended additional therapy focused on home exercises. (R. 491).  At physical therapy with

---

[5] Plaintiff attended physical therapy with OTA Erleen Johnson on May 23, 2018, showing unchanged grip, flexion and extension capabilities. (R. 484).

[6] The X-ray assessment noted an "old healed [wrist] fracture" and no changes since the prior X-rays. (R. 515; *see also* R. 490-91).

OTA Haynes on July 23, 2018, Plaintiff reported pain at a scale of "5/10"[7] and had a DASH

score of 68 out of 100. (R. 496-97). Her grip strength was unchanged, but she could flex her left

wrist to "30/50" degrees and extend it to "55/50" degrees. (R. 497).

On November 28, 2018, OTA Vivan Torres certified that Plaintiff attended occupational

therapy for her left wrist at Bronx Care twice per week. (R. 554). OTA Torres noted that

Plaintiff's wrist was "[n]on-[w]eight [b]earing." (R. 555).

## 2. Medical Evidence Regarding Psychiatric and Cognitive Impairments

### i. Childhood Records

On December 9, 1975, when Plaintiff was ten years old, she was referred to a

psychologist for evaluation due to little academic progress and learning deficiencies. (R. 535-

37). For example, she could not add or subtract numbers through five and was not completely

familiar with the alphabet. (R. 535). She also demonstrated perceptual problems. (R. 541).

Plaintiff's full scale I.Q. was 51. (R. 548).

### ii. Boston Road Medical Center

### (a) Before the Alleged Disability Onset Date

Plaintiff began psychiatric treatment at Boston Road Medical Center ("BRMC") on

November 4, 2011 for depression, anxiety and hearing voices. (R. 685). She reported that her

depression started the prior summer due to "problems with her daughters." (*Id.*). She denied

suicidal or homicidal ideations. (*Id.*). On examination, Plaintiff demonstrated "no gross

abnormalities." (*Id.*). Dr. Lorena Grullon-Figueroa detected a euthymic mood, with normal

speech and intact language skills. (*Id.*). She also found Plaintiff's associations intact, her

---

[7] This progress note indicates "severe pain," but this description appears to have been copy-and-pasted into several progress notes from Plaintiff's initial physical therapy appointment in February 2018, despite her reports that her pain had decreased. (*See* R. 446, 458, 471, 496).

thinking logical and her thought content appropriate. (*Id.*).  Plaintiff's cognitive functioning was also intact and age appropriate, demonstrating full orientation, no signs of anxiety, and no signs of attentional or hyperactive difficulties. (*Id.*).  Plaintiff's insight and judgment were also intact, and she was deemed "stable." (R. 685-86).  Dr. Grullon-Figueroa prescribed Remeron. (R. 686). At a follow-up on December 23, 2011, Plaintiff continued to report depression, but again presented normally on examination. (R. 687).  In addition to reiterating her previous findings, Dr. Grullon-Figueroa opined that Plaintiff's recent and remote memory were intact and she was oriented to time, place and person. (*Id.*).  She increased Plaintiff's Remeron dosage due to Plaintiff's continued depression as well as insomnia. (R. 688).

When Plaintiff returned on October 14, 2013, she reported continued anxiety symptoms including "many" anxiety attacks per day, as well as depressive symptoms "a few times a week." (R. 689).  Plaintiff described anhedonia, lack of energy, difficulty concentrating, excessive fatigue, sleep difficulties and sadness. (*Id.*).  Plaintiff's mother had passed away the previous May. (*Id.*).  On examination, Plaintiff appeared normal except for being "sad looking" and exhibiting signs of "mild depression," as well as fair insight and social judgment. (*Id.*).  Dr. Grullon-Figueroa added unspecified anxiety disorder to Plaintiff's diagnoses and prescribed Ambien. (R. 689-90).  She opined that Plaintiff was "experiencing severe anxiety or panic." (R. 690).  At a follow-up on October 28, 2013, Plaintiff reported an improved mood and lessened symptoms in frequency or intensity, but still struggled with sleep difficulties, depression and anxiety. (R. 691).  This time, her insight was intact, and the rest of the mental status examination was normal. (*Id.*).

When Plaintiff returned to BRMC on December 20, 2013, she reported "stable and uneventful" behavior, denying any psychiatric problems, symptoms or side effects. (R. 693).

Plaintiff's mood was euthymic, with no signs of depression or elevation. (*Id.*).  Dr. Arturo Marrero-Figarella found Plaintiff otherwise unremarkable, and prescribed trazodone in addition to Plaintiff's other medications. (*Id.*).  On January 16, 2014, Plaintiff discussed "many feelings" of anxiety, frustration, sadness, low self-esteem and relationship problems but still "denie[d] all psychiatric problems" and asserted that she was "responding well" to her medications. (R. 695).

Over the next several sessions through May 2016,[8] Plaintiff continued to report stable and uneventful behavior, without psychiatric problems or side effects. (R. 697, 699, 701, 709, 711, 713, 715, 717, 719).  She was deemed largely normal with no signs of anxiety, the ability to think abstractly, and cognitive functioning commensurate with her age and abilities. (*Id.*).

On July 21, 2016, Plaintiff complained that her feelings of apprehension, sadness and worthlessness, sleeping problems, anergia and anhedonia had all gotten worse. (R. 721).  She also reported more frequent difficulty concentrating, Tachycardia, rapid breathing and sweating. (*Id.*).  Her irritability was still occurring and her social isolation had worsened. (*Id.*).  On examination, she presented as flat, glum, sad looking, wary, distracted, minimally communicative and anxious, with a depressed mood. (*Id.*).  Dr. Marrero-Figarella noted that Plaintiff "appear[ed] near tears," exhibiting signs of "severe depression," including slowness of physical movement, as well as anxiety such as restlessness. (*Id.*).  He rated Plaintiff's judgment and insight as poor. (*Id.*).  However, her cognitive functioning, memory, speech and affect remained normal, including the ability to abstract and do arithmetic calculations. (*Id.*).  He also opined that Plaintiff was "stable" and did not require hospitalization. (R. 722).  Dr. Marrero-Figarella came to the same conclusion on December 13, 2016. (R. 344).

---

[8] These specific appointments occurred on March 5, 2014, (R. 697), April 3, 2014, (R. 699), July 7, 2014, (R. 701), April 27, 2015, (R. 709), August 18, 2015, (R. 711), October 13, 2015, (R. 713), December 8, 2015, (R. 715), April 28, 2016, (R. 717), and May 23, 2016, (R. 719).

The following year, on May 13, 2017, Plaintiff saw Psychiatric Mental Health Nurse Practitioner ("PNP") Phillippe K.Z. Bah, reported no psychiatric problems and appeared normal on examination in all respects. (R. 723).

**(b) After the Relevant Period**

On January 16, 2018, Plaintiff reported more frequent and intense depressive symptoms. (R. 725). She also had been unable to sleep "for some time," and felt helpless and hopeless. (*Id.*). However, aside from a sad and anxious mood, she presented normally on examination and was friendly and communicative. (*Id.*). Family Psychiatric Mental Health Nurse Practitioner ("FPNP") Chukwuka Mordi diagnosed a single episode of major depressive disorder, as well as anxiety disorder. (725-26).

The following month, on February 17, 2018, Plaintiff told PNP Bah that she was "stable" on her current medications, denying all psychiatric problems except for inadequate sleep. (R. 727). There was no evident depression or mood elevation on examination. (*Id.*).

On March 29, 2018, Jasmin John, Licensed Clinical Social Worker ("LCSW") and clinic supervisor at BRMC, wrote a letter advising that Plaintiff continued to be seen for behavioral therapy and medication management. (R. 527). LCSW John described Plaintiff's diagnoses as single-episode unspecified major depressive disorder and unspecified anxiety disorder. (*Id.*). LCSW John attached records from PNP Bah and Dr. Grullon-Figueroa from November 4, 2011 and February 17, 2018. (R. 525-32).

The following month, on April 21, 2018, despite increased stress due to her daughter's illness, Plaintiff insisted that she was stable and did not need an adjustment to her medications, continuing to present normally on examination. (R. 729). PNP Bah made similar observations on May 19, 2018. (R. 731). Plaintiff reported that she was "still fighting" for "SSI" even though she was denied three times. (*Id.*). On July 21, 2018, PNP Bah noted that Plaintiff continued to be

stable, even though she had foregone medications for one month due to missing her last appointment for a social security hearing. (R. 733).  At the next two appointments, Plaintiff denied psychiatric problems again, appeared normal and deemed stable on examination. (R. 735, 737).

On November 17, 2018 Plaintiff brought her childhood records from December 1975 "which show[ed] she ha[d] [sic] intellectual disability since age 10." (R. 739).  However, Plaintiff continued to present as normal and stable on her medications, denying all psychiatric problems or side effects. (*Id.*).  Based on a discussion with the "clinic director," PNP Bah informed Plaintiff that because she was "not compliant with [her] appointment[s]," the facility would complete disability paperwork for her when she was "consistent with [her] treatment plan." (*Id.*).  That same day, PNP Bah wrote a letter listing the same diagnoses as LCSW John's letter and noting that Plaintiff currently took Remeron and Ambien. (R. 553).

On December 15, 2018, Plaintiff reported continued stability and no side effects from her medications. (R. 741).  The results of her mental status examination were unchanged. (*Id.*).  She told PNP Bah that her SSI application had been approved, but PNP Bah noted that the agency had subpoenaed medical records to be provided before approval. (*Id.*).  He explained to Plaintiff that they would be sent "soon." (*Id.*).

**B.  Opinion Evidence**

**1.  Medical Source Opinions**

On July 21, 2016, following an appointment with Plaintiff at BRMC, Dr. Marrero-Figarella submitted a letter to the agency requesting that it reconsider its negative disability determination. (R. 373).  He stated that she was seen for both behavioral therapy and medication management, and had been diagnosed for both severe major depression with melancholia and

unspecified anxiety disorder. (*Id.*).  Dr. Marrero-Figarella opined that Plaintiff was "still very depressed and anxious and not able to function in [sic] a daily schedule." (*Id.*).

## 2. Opinions from Consulting Physicians

On June 11, 2016, Jeanne Villani, Psy. D. conducted a psychiatric evaluation. (R. 365). Plaintiff lived with her daughter and completed up to the eleventh grade in special education. (*Id.*).  Plaintiff told Dr. Villani that she last worked as a sales associate in 1983. (*Id.*).  Plaintiff had never been hospitalized for psychiatric reasons, but took medication for depression and anxiety, seeing "Dr. Erika" at BRMC every two weeks. (*Id.*).

Plaintiff reported anxiety, difficulty falling asleep, dysphoria, crying spells, hopelessness, loss of usual interests, worthlessness and diminished pleasure. (*Id.*).  Plaintiff's anxiety manifested as difficulty concentrating, fears "not know[ing] who is going to be near her" outside, and irritability. (*Id.*).  She denied any panic attacks, mania, suicidal ideation or homicidal ideation. (*Id.*).  She also discussed thought disorder symptoms, but Dr. Villani opined that "it was not clear whether they were hallucinations." (*Id.*).  Plaintiff "sometimes daze[d] out" and "wanted to . . . hit her daughter," with whom she had a "strange relationship." (R. 365-66).  Dr. Villani observed that "[c]ognitively," Plaintiff "present[ed]" with "several significant deficits in short-term and long-term memory, concentration difficulties, receptive language deficits, word finding deficits, some disorientation, some poor planning and sequencing difficulties, and certainly difficulty in abstracting information." (R. 366).

Upon examination, Plaintiff was cooperative but appeared immature, with a very limited and poor manner of relating. (*Id.*).  Her mood was dysthymic, and she cried during the session. (R. 367).  She demonstrated appropriate eye contact but lethargic motor behavior. (R. 366). Furthermore, although she demonstrated fluent speech intelligibility and a clear quality of voice, her receptive language was poorly-developed, and she struggled with finding expressive words.

(*Id.*).  There was also "great hesitation" between her responses, and often, she could not respond

at all. (*Id.*).  As to Plaintiff's thought processes, she "presented as being confused," and

"appeared helpless, hopeless, and restricted." (*Id.*).  However, Dr. Villani did not detect any

evidence of hallucinations, delusions or paranoia. (*Id.*).  Dr. Villani found Plaintiff's sensorium

mildly impaired, and her orientation limited. (R. 367).  Plaintiff knew her name and that she was

in an office, but did not know what time, date or day it was. (*Id.*).

Dr. Villani found Plaintiff's cognitive functioning "within the deficient range," with a

"limited" general fund of information. (*Id.*).  Her attention, concentration and recent as well as

remote memory skills were impaired based on "limited intellectual functioning." (*Id.*).  Plaintiff

had difficulty counting, doing simple calculations and doing serial threes. (*Id.*).  Moreover, she

could not recall two out of three objects immediately and was unable to recall any of the objects

after five minutes. (*Id.*).  She also presented emotional distress in doing these exercises. (*Id.*).

Plaintiff's insight was limited and her judgment fair. (*Id.*).

As to activities of daily living, Plaintiff stated that she could dress, bathe, cook, clean, do

laundry, shop and manage money. (R. 367).  However, she could not take public transportation

or drive. (*Id.*).  Her income came from food stamps. (*Id.*).  Socially, she was "very limited,"

without any real friends or family relationships. (*Id.*).  She also lacked hobbies or interests,

spending her days doing "basic adaptive functioning." (*Id.*).  Dr. Villani opined that although

Plaintiff "appear[ed] to have self-care skills," she "d[id] not appear to be able to engage in social

or leisure work activities." (*Id.*).

Dr. Villani diagnosed persistent depressive disorder and generalized anxiety disorder. (R.

368).  In a medical source statement, she opined that Plaintiff was moderately limited in

following and understanding simple directions and instructions; performing simple tasks

independently; learning new tasks; performing complex tasks independently; and relating

adequately with others. (*Id.*).  Plaintiff was mildly limited in maintaining attention and

concentration as well as making appropriate decisions. (*Id.*).  Dr. Villani further concluded that

these difficulties were caused by cognitive deficits and depression. (*Id.*).  However, Plaintiff was

not limited in maintaining a regular schedule or appropriately dealing with stress. (*Id.*).  She

assigned a guarded prognosis, opining that Plaintiff would need assistance managing her funds

and that Plaintiff's psychiatric and cognitive problems "may significantly interfere with her

ability to function on a daily basis." (*Id.*).

### 3.  State Agency Opinions

On June 23, 2016, State consultant E. Kamin, Ph.D. submitted a Medically Determinable

Impairments and Severity form after reviewing the medical evidence, including Dr. Villani's

report. (R. 69-71).  Dr. Kamin found that Plaintiff's affective and anxiety disorders constituted

severe impairments and analyzed their resulting functional limitations. (R. 71).  With regard to

understanding and memory, Plaintiff was moderately limited in remembering locations and

work-like procedures as well as understanding and remembering very short and simple

instructions, and markedly limited in understanding and remembering detailed instructions. (R.

73-74).  Plaintiff was also moderately limited in completing a normal workday and workweek

without interruptions from psychologically based symptoms and performing at a consistent pace

without an unreasonable number and length of rest periods. (R. 74).  In the category of sustained

concentration and persistence, Plaintiff was moderately limited in carrying out very short and

simple instructions, as well as maintaining attention and concentration for extended periods.

(*Id.*).  She was markedly limited in carrying out detailed instructions. (*Id.*).  However, she was

not significantly limited in sustaining an ordinary routine without special supervision, working in

coordination with or in proximity to others without being distracted, or making simple work-

related decisions. (*Id.*).  Plaintiff was not limited at all in performing activities within a schedule, maintaining regular attendance and being punctual within customary tolerances. (*Id.*).

Socially, Plaintiff was moderately limited in interacting appropriately with the general public; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; asking simple questions or requesting assistance; and maintaining socially appropriate behavior while adhering to basic standards of neatness and cleanliness. (R. 74-75).  She was not limited, however, in accepting instructions and responding appropriately to criticism from supervisors. (R. 74).  As to adaptation skills, Plaintiff was moderately limited in responding appropriately to changes in the work setting, traveling in unfamiliar places or using public transportation, and setting realistic goals or making plans independently. (R. 75).  Plaintiff was not significantly limited in her ability to be aware of normal hazards and take appropriate precautions. (*Id.*).  Dr. Kamin opined that Plaintiff was capable of meeting the basic mental demands of simple, unskilled work in a setting with low contact with the general public. (R. 75-76).

## C.  Nonmedical Evidence

In a Field Office Disability Report, it was noted that during a May 10, 2016 interview with the agency, Plaintiff demonstrated difficulty reading, answering and understanding. (R. 295).  She also had problems spelling the names of her medications and remembering. (*Id.*).

Plaintiff completed an undated disability report claiming that her depression, learning disability, high blood pressure and insomnia all limited her ability to work. (R. 287-88).  Plaintiff indicated that she could read and understand English and that she could write more than her name in English. (R. 287).  She also stated that she completed the report herself. (R. 288).

Plaintiff also completed an Adult Function Report on May 18, 2016 without indicating that anyone else helped her complete it. (R. 297).  According to the report, her activities of daily

living included taking her medication, eating breakfast, walking in the park, napping at noon, picking up her grandchild from the school bus, doing laundry, preparing and cooking dinner, watching an hour of television, and then getting ready for bed. (*Id.*).  Plaintiff did not care for anyone else, and took care of herself on her own. (R. 299).  She did not need special help or reminders to take care of personal needs and grooming, or to take her medicine. (R. 299-300).  She was also able to clean, iron and shop, took walks daily, and used public transportation on her own. (R. 300-01).  Plaintiff further asserted that she paid bills, counted change and handled a savings account by herself, the only problem being that sometimes she overspent. (R. 302).

Plaintiff asserted that before her illnesses, she was able to eat high sodium foods, walk for long periods, concentrate, pay attention, read and write. (R. 299).  Moreover, she used to be able to sleep throughout the night, and now took several hours to fall asleep and "constantly" woke up scared. (*Id.*).  She also stated that she sometimes had a low appetite due to her depression. (*Id.*).  Furthermore, her hands cramped up "most days." (R. 303).[9]

Plaintiff often found herself daydreaming which created problems paying attention. (R. 304).  She could not finish what she started, nor follow spoken or written instructions. (R. 304-05).  It took her a long time to complete chores. (R. 304).  In addition, stress increased her depression, and she had trouble remembering things, such as the location of her house keys. (R. 305).  However, she did not have any problems getting along with authority figures and had never lost a job for this reason. (*Id.*).

Although Plaintiff did not own a computer, she conversed on the phone and socialized in person "whenever [she felt] up to it." (R. 302).  She did not list any problems getting along with family, friends, neighbors or anyone else. (R. 303).

---

[9] Plaintiff was right-handed. (R. 304).

**D. Plaintiff's Testimony**

Plaintiff testified at the hearing held on December 3, 2018. (R. 45). Plaintiff lived with her twenty-seven-year-old daughter. (R. 52). She worked as a babysitter until September 2017, but stopped due to a fracture to her left hand and depression. (R. 46, 47). The fracture occurred in December of 2017. (R. 48-49). Plaintiff was right-handed, but the fracture prevented her from cooking, dressing herself, doing laundry, doing her hair, and carrying shopping bags without her daughter's help. (R. 47-49). She also could not open jars independently, (R. 48), and sometimes could not open mail, (R. 52). Plaintiff had been in physical therapy for "months," but testified that it was not helping and her doctors told her "it's getting a little better but not the way they want to." (R. 47, 49).

As to Plaintiff's depression, she explained that she "g[o]t aggravated because" her left hand fracture prevented her from doing "stuff that [she] want[ed] to do and [that] [she] c[ould]n't do." (R. 51). She saw a therapist and psychiatrist, taking medications that helped her sleep and "ma[d]e[] her feel better." (R. 51, 55). She had good days and bad days when she was "cranky," causing her to "just stay home" or stay in her room. (R. 55).

Plaintiff's babysitting job involved caring for a two and four year old from the same family all day in Manhattan. (R. 46-47, 53-54). When she babysat, she would wake up at 6:30 A.M. daily to take the train or bus to their home. (R. 53). She quit because her left hand fracture prevented her from feeding and bathing them, and because of her depression. (R. 54). Plaintiff did not believe that she could work as a babysitter even if the children were "older kids that [she] didn't need to pick up" with her hands because she would not want them to see her "aggravated" from her depression. (R. 51). When she got aggravated, she would "just walk away," or go to the store and go to her room. (R. 51-52).

-17-

Plaintiff also testified that she did not "know how to read much" and was in special education through the eleventh grade. (R. 50, 54, 56). She could "understand one or two," but not "the rest," and needed her daughter to help her read. (R. 50, 54). Her daughter read her mail for her and helped her keep track of appointments, bills and important dates. (R. 50). For example, Plaintiff's daughter advised her of her hearing date, reviewed rent and utility bills, and told her how much she owed. (R. 50, 52). Plaintiff's daughter also accompanied her to obtain money orders and helped her fill them out and mail them. (R. 52-53). Both Plaintiff and her daughter kept track of rent and utility bill due dates. (R. 53). Plaintiff did not use a computer but used a cell phone for scheduling appointments. (R. 52).

Plaintiff did not socialize with friends or family besides her daughter. (R. 53, 55). She did not have any hobbies and did not do anything else for fun. (R. 55).

**E. Vocational Expert's Testimony**

Vocational expert ("VE") Helene J. Feldman testified at the December 3, 2018 hearing. (R. 10, 56). Ms. Feldman reported that Plaintiff's past work at as a babysitter qualified as medium exertional work with an SVP of 3, listed as 301.677-010 in the Dictionary of Occupational Titles ("D.O.T."). (*See* R. 58). The ALJ posed the following residual functional capacity ("RFC") hypothetical to Ms. Feldman:

> So we need to talk about a hypothetical individual of the claimant's age, education and background. And this individual has no exertional limitations. They can do simple, routine work with up to four step instructions. Occasional and superficial interaction with the general public. Occasional interaction with supervisors, . . . occasional and superficial interaction with co-workers[,] [a]nd occasional changes in the work setting. They can occasional[ly] make work related decisions. And they can frequently finger or handle with the non-dominant left hand.

(R. 58-59). Based on the assumptions provided by the ALJ, Ms. Feldman testified that such an individual could not return to Plaintiff's past work. (R. 59). However, Ms. Feldman testified that

the hypothetical individual could work as a candy maker helper and garment bagger at light

exertional levels, as well as a hand packager at medium exertional levels. (*Id.*).

The ALJ then posed an additional hypothetical, asking whether the same individual

would be able to find work if he or she were off task for ten percent of a shift. (*Id.*).  Ms.

Feldman testified that such an individual would not be able to find sustainable employment. (R.

59-60).  Ms. Feldman further explained that "typically" an individual could not be off task for

"more than 5% [of a shift], and that's in addition to regularly scheduled breaks on a consistent

basis." (*Id.*).

Plaintiff's counsel asked whether the same individual from the first hypothetical would

be able to find work if he or she could only occasionally understand simple directions. (R. 60-

61).  Ms. Feldman responded that the individual would be able to work in the previous jobs she

listed. (R. 61).

### F.  ALJ Andrea Addison's Decision

In her decision, dated January 15, 2019, ALJ Addison followed the five-step procedure

established by the Commissioner for evaluating whether an individual is disabled. *See* 20 C.F.R.

§§ 404.1520(a); 416.920(a).  At step one, the ALJ found that Plaintiff had not engaged in

substantial gainful activity since January 1, 2015, Plaintiff's original alleged disability onset

date. (R. 12).  At step two, the ALJ found that Plaintiff had the following severe impairments:

status post left wrist fracture, learning disorder and major depressive disorder with anxiety. (*Id.*).

The ALJ found that Plaintiff's hypertension was non-severe. (R. 13).  At step three, the ALJ

found that Plaintiff did not have an impairment or combination of impairments that met or

medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P,

Appendix I. (R. 13-16).

Before step four, the ALJ made the following assessment of Plaintiff's RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is capable of frequent fingering and handling with the non-dominant left hand. She can perform only simple routine work with up to four step instructions. The claimant is capable of occasional and superficial interaction with [the] general public and coworkers. She is also capable of occasional interaction with supervisors. The claimant can deal with only occasional changes in work setting[s] and can occasionally make work related decisions. The claimant needs to be trained by demonstration. Lastly, she must be allowed to be off task [for] 5% of a work shift.

(R. 16). At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (R. 20). Proceeding to step five of the sequential analysis, the ALJ considered Plaintiff's age, education, work experience and RFC, and concluded that there are jobs that exist in significant numbers in the national economy that Plaintiff could perform. (R. 20-21). Relying upon the testimony of the vocational expert, the ALJ stated that Plaintiff could perform the requirements of representative occupations such as a candy marker helper, hand packager and garment bagger. (R. 21). Accordingly, the ALJ determined that Plaintiff was not disabled. (*Id.*).

## II. DISCUSSION

Plaintiff argues that remand is warranted because (1) the ALJ improperly rejected all opinion evidence regarding her mental impairments; (2) the ALJ failed to develop the record with respect to both her physical and mental impairments; and (3) the ALJ erroneously evaluated Plaintiff's language skills. In response, the Commissioner contends that (1) the ALJ weighed the opinions regarding Plaintiff's mental impairments appropriately; (2) the record was sufficient for the ALJ to evaluate all of Plaintiff's limitations; and (3) substantial evidence supports the ALJ's finding that Plaintiff could communicate in English.

## A.  Legal Standards

A claimant is disabled if he or she "is unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting 42 U.S.C. § 423(d)(1)(A)).  The SSA has enacted a five-step sequential analysis to determine if a claimant is eligible for benefits based on a disability:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008); 20 C.F.R. §§ 416.920(a)(4)(i)-(v), 404.1520(a)(4)(i)-(v)).

The claimant has the general burden of proving that he or she is statutorily disabled "and bears the burden of proving his or her case at steps one through four." *Cichocki*, 729 F.3d at 176 (quoting *Burgess*, 537 F.3d at 128).  At step five, the burden then shifts "to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 445 (2d Cir. 2012).

## B.  Standard of Review

When reviewing an appeal from a denial of SSI or disability benefits, the Court's review is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Selian v. Astrue*, 708 F.3d 409, 417 (2d

Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 42 U.S.C. §

405(g).  The Court does not substitute its judgment for the agency's, "or determine *de novo*

whether [the claimant] is disabled." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir.

2012) (alteration in original) (quoting *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998)).

However, where the proper legal standards have not been applied and "might have affected the

disposition of the case, [the] court cannot fulfill its statutory and constitutional duty to review the

decision of the administrative agency by simply deferring to the factual findings of the ALJ."

*Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109,

112 (2d Cir. 1984)).  Therefore, "[f]ailure to apply the correct legal standards is grounds for

reversal." *Id.*  "Where there are gaps in the administrative record or the ALJ has applied an

improper legal standard," remand to the Commissioner "for further development of the

evidence" is appropriate. *Rosa v. Callahan*, 168 F.3d 72, 82–83 (2d Cir. 1999) (quoting *Pratts v.

Chater*, 94 F.3d 34, 39 (2d Cir. 1996)).

## C.  The ALJ's RFC

Plaintiff alleges that with regard to her psychiatric and cognitive impairments, the ALJ

erroneously afforded "little weight" to all three expert opinions of record, which precluded her

from fulltime work on a normal schedule due to her cognitive deficits, depression and anxiety.

(Docket No. 14 at 14-18).  The Commissioner responds that the weight the ALJ allocated to

these opinions was appropriate because they were inconsistent with benign mental status

examinations during the relevant period and Plaintiff's self-reported activities of daily living.

(Docket No. 16 at 20-21, 23).  The Commissioner maintains that in any event, Dr. Villani and

Dr. Kamin's recommendations are not inconsistent with the ALJ's RFC assessment permitting

Plaintiff to work with some restrictions. (*Id.* at 21-22, 24-25).  The Court agrees with the

Commissioner that the ALJ acted appropriately when she afforded less weight to these opinions, and the RFC was supported by substantial evidence because it still addressed the majority of the limitations in Dr. Villani and Dr. Kamin's findings.

The RFC is what an individual can still do in a work setting, despite physical and/or mental limitations caused by impairments and any related symptoms, such as pain. *See Traufler v. Astrue*, No. 7:11-1089, 2012 WL 7753772, at *3 (N.D.N.Y. Nov. 30, 2012), *report and recommendation adopted*, 2013 WL 1092124 (N.D.N.Y. Mar. 15, 2013) (citing 20 C.F.R. §§ 404.1545, 416.945(a)); *see also Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999).  The RFC assessment must include a discussion of the individual's abilities on that basis. *Melville*, 198 F.3d at 52.

When determining a claimant's RFC, under the treating physician rule, an ALJ must give the medical opinion of a treating physician "controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence," *Rosa*, 168 F.3d at 78-79, and may only disregard a treating source opinion under specific circumstances, *see generally Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  This is because the treating physician is in a more capable position to provide a detailed picture of a claimant's impairments than consultative physicians who may see the claimant on just one occasion or not at all. *See Estela-Rivera v. Colvin*, No. 13 CV 5060(PKC), 2015 WL 5008250, at *13 (E.D.N.Y. Aug. 20, 2015).  When a treating source opinion is not afforded controlling weight and the ALJ must consider opinions from other acceptable medical sources, the ALJ must consider several factors: "(1) length of treatment relationship and frequency of examination; (2) nature and extent of treatment relationship; (3) evidence supporting the opinion; (4) how consistent [the] opinion is with [the] record as a whole; (5) specialization in contrast to condition being treated; and (6) other

significant factors." *See Atkyns v. Colvin*, No. 6:13-CV-161 (GLS/ESH), 2014 WL 4637090, at

*7 (N.D.N.Y. Sept. 16, 2014) (citing 20 C.F.R. § 404.1527(c)).  With regard to any medical

opinion not given controlling weight, the more consistent it is with the record as a whole, the

more weight it will be given. *See* 20 C.F.R. § 404.1527(c)(4).

### 1.  Dr. Marrero-Figarella

Plaintiff alleges that the ALJ improperly afforded "little weight" to Dr. Marrero-

Figarella's opinion that as of July 21, 2016, she was "still very depressed and anxious and not

able to function in [sic] a daily schedule." (Docket No. 14 at 16-17; R. 373).  Plaintiff argues that

the ALJ's determination was erroneous because she relied on her function report and statements

to Dr. Villani, even though the report was completed before her alleged period of disability, and

Dr. Villani found Plaintiff cognitively impaired and unable to manage funds independently.

(Docket No. 14 at 16-17).  The Commissioner responds that the ALJ was entitled to rely on this

evidence and it was appropriate to afford Dr. Marrero-Figarella's opinion "little weight."

(Docket No. 16 at 23).  Because Dr. Marrero-Figarella's opinion was inconsistent with the record

as a whole, Plaintiff's arguments fail.

As an initial matter, although Dr. Marrero-Figarella was Plaintiff's treating psychiatrist

when he submitted this opinion, the record indicates that he never treated her during the amended

period of disability, from October 1, 2017 through December 15, 2018.  Therefore, the treating

physician rule is inapplicable to his opinion and the ALJ was not obligated to afford it

controlling weight.[10] *See Monette v. Astrue*, 269 Fed. App'x. 109, 112 (2d Cir. 2008) (summary

---

[10] A physician with no ongoing relationship with the claimant during the alleged period of disability is "not in a unique position to make a complete and accurate diagnosis" within the meaning of the treating physician rule. *See Arnone v. Bowen*, 882 F.2d 34, 41 (2d Cir. 1989) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir.1983)).  An exception to this principle exists where a current treating physician provides a retrospective opinion regarding the claimant's limitations during the relevant period. *Ruff v. Saul*, No. 3:19-cv-01515 (SRU), 2020 WL 6193892, at *10 (D. Conn. Oct. 22, 2020); *see also Monette*, 269 Fed. App'x. at 112 (noting that retrospective opinion by subsequent treating physician may deserve "some, or significant weight").  However, that exception is

order); *Rogers v. Astrue*, 895 F. Supp. 2d 541, 549–50 (S.D.N.Y. 2012).  Consequently, the ALJ did not commit *per se* legal error in affording less than controlling weight to this medical opinion from July 2016. *See Ruff*, 2020 WL 6193892, at *10.

The Court also finds that the ALJ acted appropriately in affording Dr. Marrero-Figarella's opinion less weight because, as the ALJ explained, it was inconsistent with both Plaintiff's self-reported activities of daily living and the treatment records. *See Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 7–8 (2d Cir. 2017) (summary order).  The ALJ concluded that Plaintiff's function report undermined Dr. Marrero-Figarella's conclusions because the report stated that she was "able to take public transportation, pay bills, count change, and handle a savings account." (R. 19, 300-02).  Similarly, Plaintiff told Dr. Villani that she was "able to dress, bathe, cook, clean, and manage money." (R. 19, 367).  In addition, the ALJ noted that despite Plaintiff's low I.Q. scores from 1975, "recent medical evidence indicate[d] stable symptoms" and Plaintiff "has been able to perform work as a babysitter of toddlers," evidencing "only moderate difficulties in . . . adapting and managing herself." (R. 16-18).

This analysis is supported by substantial evidence because the record does not document *any* difficulties in managing a schedule that would support Dr. Marrero-Figarella's opinion. *See Monroe*, 676 F. App'x at 7–9.  According to Plaintiff's own statements in numerous portions of the record, she was able to independently engage in a plethora of activities of daily living involving a schedule. (R. 297, 299-302, 367).  Furthermore, as the ALJ noted, the remainder of "the record," including the treatment notes from the relevant period, "contains evidence mostly indicating controlled symptoms," none of which interfered with this skill. (R. 17-18; *see, e.g.*, R.

---

inapplicable because there is no evidence that Dr. Marrero-Figarella treated Plaintiff any time after December 2016, and thus could not provide a "detailed, longitudinal view" of Plaintiff's impairments during the time she alleges that she was disabled. *See Ruff*, 2020 WL 6193892, at *10 (quoting *Flynn v. Comm'r of Soc. Sec. Admin.*, 729 F. App'x 119, 122 (2d Cir. 2018)) (internal quotation marks omitted); (*see also* R. 344).

725, 727, 729, 733).  Although Plaintiff reported difficulty sleeping while she was still working

as a babysitter and at two appointments in 2018, (R. 725, 727), the ALJ correctly noted that

Plaintiff presented no further abnormalities for the rest of her treatment, (R. 18).  Moreover, none

of the records indicate that Plaintiff's insomnia actually prevented her from maintaining a

schedule or otherwise engaging in work activities. *See Roth v. Astrue*, No. 3:08cv00436

(SRU)(WIG), 2008 WL 5585275, at *17 (D. Conn. Nov. 14, 2008).

It is entirely appropriate for the ALJ to consider activities of daily living in the RFC when

they "offer insight on how [the claimant's] impairments affect her ability to work and undertake

activities of daily life." *See Keovilay v. Berryhill*, No. 3:19-cv-0735 (RAR), 2020 WL 3989567,

at *5 (D. Conn. July 15, 2020); *see also Burch v. Comm'r of Soc. Sec.*, No. 17-CV-1252P, 2019

WL 922912, at *5 (W.D.N.Y. Feb. 26, 2019).  This is because a claimant's activities of daily

living are an important indicator of the intensity and persistence of her symptoms. *See* 20 C.F.R.

§ 416.929(c)(3).  Accordingly, an ALJ is entitled to afford less weight to a medical opinion

where the treatment notes and the claimant's activities of daily living reflect a greater ability to

engage in substantial gainful activity than that prescribed by the opinion, as is the case here. *See

Rusin v. Berryhill*, 726 F. App'x 837, 839 (2d Cir. 2018) (summary order); *Monroe*, 676 F.

App'x at 7–8.

Plaintiff asserts that the ALJ's reliance on the function report was misplaced because she

completed the report before the alleged period of disability and testified that her daughter helped

her with most of these tasks. (Docket No. 14 at 17; R. 47-53).  She further argues that regardless

of what she told Dr. Villani, Dr. Villani opined that she would at least need assistance managing

her funds. (Docket No. 14 at 17; R. 368).  All of these contentions fall flat.  As to Plaintiff's first

assertion, the ALJ was entitled to weigh Plaintiff's function report alongside the evidence of her

limitations during the relevant period and the rest of the record. *See Matta v. Astrue*, 508 F. App'x. 53, 56 (2d Cir. 2013).  The ALJ did so, and found Plaintiff's "statements concerning the intensity, persistence, and limiting effects of her symptoms . . . not consistent with the record as a whole" — a determination which Plaintiff does not challenge.[11] (R. 19).  "Inconsistencies between Plaintiff's testimony and the medical record are strictly for the ALJ to resolve, and her assessment cannot be second-guessed on judicial review." *DiMaggio v. Astrue*, No. 5:10-CV-172, 2011 WL 4748280, at *8 (D. Vt. Oct. 6, 2011).  The Court therefore declines to supplant the ALJ's role as factfinder in making this assessment.[12] *See id.*  Furthermore, with regard to Plaintiff's contentions regarding Dr. Villani's findings, as explained below, it was not error for the ALJ to afford limited weight to that opinion. (*See infra* Section II.C.2).

For these reasons, the ALJ committed no error in assigning limited weight to Dr. Marrero-Figarella's medical opinion. *See Monroe*, 676 F. App'x at 7–8.  The ALJ appropriately evaluated the entire record and found that the balance of evidence undermined Dr. Marrero-Figarella's conclusions. *See id.*

---

[11] Moreover, numerous District Courts have found no error in such a credibility determination where the claimant's function report and/or statements to medical sources belie his or her hearing testimony, "suggesting [that the claimant] [wa]s less than forthcoming about his [or her] ability to function." *See Duffy v. Comm'r of Soc. Sec.*, No. 17-cv-3560 (GHW)(RWL), 2018 WL 4376414, at *20 (S.D.N.Y. Aug. 24, 2018), *report and recommendation adopted*, 2018 WL 4373997 (S.D.N.Y. Sept. 13, 2018); *see also Williams v. Colvin*, No. 15-cv-4173 (ALC), 2016 WL 3034494, at *11 (S.D.N.Y. May 26, 2016); *Sellie v. Astrue*, No. 07-CV-0475 (VEB), 2009 WL 2882946, at *14 (N.D.N.Y. Sept. 4, 2009).

In addition, the Court is not aware of any cases within this Circuit specifically addressing the evidentiary value of a function report completed before the alleged period of disability.  However, courts elsewhere have rejected arguments similar to Plaintiff's, where, as here, an allegedly "outdated" report is "merely one piece of evidence" used in assessing credibility, and the treatment notes similarly indicate a broader range of functional capability than that alleged by the claimant. *See, e.g.*, *Arthur v. Berryhill*, No. 3:17cv285 (HEH), 2018 WL 3233362, at *9 (E.D. Va. June 12, 2018), *report and recommendation adopted*, 2018 WL 3232777 (E.D. Va. July 2, 2018); *Brank v. Astrue*, 636 F. Supp. 2d 335, 349 (D. Del. 2009).

[12] The Court rejects Plaintiff's argument that the function report "did not ask whether [she] need[ed] assistance performing the various activities." (Docket No. 14 at 17).  Plaintiff misstates the record, as the function report specifically asked whether anyone "help[ed]" Plaintiff perform many activities. (R. 299-301).

**2. Dr. Villani**

Plaintiff also complains that the ALJ erred in assigning "little weight" to Dr. Villani's opinion. (Docket No. 14 at 14). As a preliminary matter, the Court notes that the ALJ only assigned "little weight" to one aspect of Dr. Villani's opinion, namely, her conclusion that Plaintiff was moderately limited in following and understanding simple instructions. (R. 19). In addition, the ALJ's determination was proper because this finding was inconsistent with the treatment notes evidencing normal cognition and improvement over time. *See Pellam v. Astrue*, 508 Fed. App'x. 87, 89–90 (2d Cir. 2013) (summary order).

"There is no requirement that the agency accept the opinion of a consultative examiner concerning a claimant's limitations." *Id.* at 89. The ALJ has discretion to weigh the opinion of a consultative examiner and attribute it appropriate weight based on his or her review of the entire record. *See Burnette v. Colvin*, 564 F. App'x 605, 608 (2d Cir. 2014) (summary order); *Torbicki v. Berryhill*, No. 17-CV-386(MAT), 2018 WL 3751290, at *5 (W.D.N.Y. Aug. 8, 2018) ("[T]he ALJ is free to disregard identified limitations that are not supported by the evidence of record.").

At the examination in June 2016, Dr. Villani found that Plaintiff presented with "several significant [cognitive] deficits" in short and long term memory, concentration, receptive language, finding word, orientation, planning and abstraction. (R. 366). Plaintiff "appeared" immature, helpless, restricted and confused, with "great hesitation" and some failures to respond. (*Id.*). Plaintiff was also unaware of the time, date or day. (R. 367). Dr. Villani found Plaintiff's insight limited and her judgment fair, and identified a poor manner of relating as well as limited social relationships. (*Id.*). Dr. Villani concluded that Plaintiff was moderately limited in following and understanding simple instructions, performing simple and complex tasks independently, learning new tasks, and relating adequately with others. (R. 368). Dr. Villani also

identified mild limitations in maintaining attention and concentration as well as appropriate

decision-making, noting that Plaintiff needed assistance managing her funds. (*Id.*).

In analyzing Dr. Villani's assessment, the ALJ explained that her opinion regarding

following and understanding simple instructions merited "little weight" because it was

"inconsistent" with numerous medical treatment notes identifying largely normal cognition and

limited symptoms of depression or anxiety. (R. 19).  Specifically, Dr. Villani's observations were

contradicted by treatment notes from the following month documenting intact short and long

term memory as well as the ability to engage in abstract thinking and perform arithmetic

calculations. (R. 19, 721).  Furthermore, the ALJ correctly observed that although Plaintiff

exhibited "severe depression" and anxiety at that appointment, (R. 721), by May 2017, the

treatment notes recorded no depressed mood or signs of anxiety, a pattern which largely

continued into the relevant period as evidenced by the May 2018 and December 2018 notes, (R.

18-19, 731, 741).[13]

After a thorough review of the record, the Court concludes that the ALJ acted

appropriately because there is insufficient medical evidence to support Dr. Villani's conclusions

regarding the severity of Plaintiff's cognitive deficits. *See Michelle S.-D. v. Comm'r of Soc. Sec.*,

No. 1:18-CV-1407 (CFH), 2020 WL 906221, at *5 (N.D.N.Y. Feb. 25, 2020).  Indeed, although

the treatment evidence demonstrates "some limitations, they do not show the degree of

restriction that Plaintiff displayed" at Dr. Villani's examination. *See Boland v. Comm'r of Soc.

Sec.*, No. 1:15-CV-1391 (GTS), 2017 WL 1532584, at *5 (N.D.N.Y. Apr. 27, 2017).  Contrary to

Plaintiff's assertions, the treatment notes demonstrate that Plaintiff's depressive symptoms and

---

[13] The ALJ referred to the May 2018 and December 2018 treatment notes as "reports," but rather than formal
opinions, these records document mental status examinations and discussions at Plaintiff's psychiatric appointments.
(R. 731, 741).  The Court will, therefore, refer to these records as "treatment notes."

anxiety largely tapered off in 2014, and even when they were present, they only minimally interfered with Plaintiff's cognitive abilities.  For example, at Plaintiff's November 4, 2011 appointment, despite hearing voices and presenting as depressed, Plaintiff demonstrated intact judgment, insight and language skills, as well as normal speech and logical thought content. (R. 685).  On December 23, 2011, Dr. Grullon-Figueroa noted that Plaintiff was oriented to time, place and person and demonstrated intact memory skills. (R. 687).  Plaintiff's cognitive functioning remained largely normal throughout the rest of her treatment, except that she demonstrated "poor" insight and judgment once in July 2016, well-before the alleged disability onset date. (R. 691, 693, 721, 723, 725, 727, 729, 731, 733, 735, 737, 739, 741).

Similarly, during the alleged period of disability between October 1, 2017 and December 2018, the treatment notes evidence only one instance of depressive symptoms, on January 16, 2018. (R. 725).  Otherwise, Plaintiff consistently reported "no psychiatric problems" and was deemed "stable," without any evident depression, mood elevation or cognitive deficits. (*E.g.*, R. 727, 729, 731, 733, 735, 737).  Even at the January 16, 2018 appointment, Plaintiff was "friendly," "communicative" and unremarkable in terms of her cognitive abilities. (R. 725).  In light of these mild and infrequent symptoms, the ALJ's conclusion as to Dr. Villani's opinion is supported by substantial evidence. *See Michelle S.-D.*, 2020 WL 906221, at *5–6.

Furthermore, Plaintiff overstates the ALJ's actions with respect to Dr. Villani's opinion. *See Harris v. Berryhill*, No. 1:15-cv-00180 (MAT), 2017 WL 4112022, at *3 (W.D.N.Y. Sept. 18, 2017).  The ALJ did not "reject" her opinion, (Docket No. 14 at 16), but rather, gave its conclusion as to Plaintiff's limitations in performing simple tasks "little weight." [14] *See Harris*,

---

[14] "Irrespective of the terminology used by the ALJ, whether it be 'great weight,' 'little weight,' 'some weight,' or 'no weight,' the relevant inquiry is whether the ALJ in fact incorporates or accounts for the limitations assessed by the medical professional in the RFC, as opposed to basing the RFC upon his or her own lay interpretation of the medical evidence." *Cook v. Comm'r of Soc. Sec.*, No. 18-CV-0726MWP, 2020 WL 1139909, at *4 n.3 (W.D.N.Y.

2017 WL 4112022, at *3–4; (R. 19).  Plaintiff also has not demonstrated that Dr. Villani's

assessment of her ability to follow and understand simple instructions — or any other aspect of

Dr. Villani's opinion — is inconsistent with the assessed RFC. *See Kya M. v. Comm'r of Soc.

Sec.*, No. 6:19-CV-06791 EAW, 2020 WL 7296849, at *6 (W.D.N.Y. Dec. 11, 2020).  The RFC

limits Plaintiff to "only simple routine work with up to four step instructions," and only

"occasional and superficial interaction" with the public and coworkers, as well as "occasional

interaction with supervisors." (R. 16).  It also requires that Plaintiff be trained by demonstration.

(*Id.*).  Courts have held that an RFC requiring four-step, simple tasks and/or training by

demonstration sufficiently addresses moderate limitations in performing or learning such tasks.

*See Phifer v. Comm'r of Soc. Sec.*, No. 18-CV-744SR, 2020 WL 1032433, at *7 (W.D.N.Y. Mar.

3, 2020); *Buscemi v. Colvin*, No. 13-CV-6088P, 2014 WL 4772567, at *14 (W.D.N.Y. Sept. 24,

2014).  Any error in affording limited weight to this aspect of Dr. Villani's report was therefore

harmless because these limitations are accounted for in the RFC. *See Kya M.*, 2020 WL

7296849, at *5; *Ryan v. Astrue*, 650 F. Supp. 2d 207, 217 (N.D.N.Y. 2009); *see also Pellam*, 508

F. App'x at 90 (finding no necessity for remand where RFC "was consistent with [consultative

examiner's] analysis in all relevant ways").

Nor has Plaintiff shown how Dr. Villani's opinion is inconsistent with the assessed RFC

with regard to her ability to maintain a schedule. *See Kya M.*, 2020 WL 7296849, at *5.

Although Dr. Villani did not find Plaintiff limited in maintaining a schedule, she found that

Plaintiff was mildly limited in maintaining attention and concentration. (R. 368).  The RFC's

restriction to "simple, routine tasks" with "only occasional supervision" accounts for this finding,

---

Mar. 9, 2020).  "An ALJ does not necessarily 'reject' opinion evidence when the opinion is assessed less than
controlling weight and where . . . the ALJ's RFC determination incorporates limitations contained in that opinion."
*Mathews v. Comm'r of Soc. Sec.*, No. 19-CV-0073MWP, 2020 WL 4352620, at *7 (W.D.N.Y. July 29, 2020); *see
also Bockeno v. Comm'r of Soc. Sec.*, No. 5:14–CV–0365 (GTS), 2015 WL 5512348, *5 (N.D.N.Y. Sept. 15, 2015).

as courts have held that such parameters accommodate moderate limitations in performing within a schedule and maintaining regular attention. *See, e.g.*, *Shannon v. Berryhill*, No. 6:16-CV-06796 MAT, 2018 WL 6592181, at *3 (W.D.N.Y. Dec. 13, 2018) (finding no error in ALJ's rejection of portions of opinions related to ability to maintain a regular schedule, as the ALJ still limited Plaintiff to "simple, routine tasks" and "working primarily alone, with only occasional supervision"); *Landers v. Colvin*, No. 14-CV-1090S, 2016 WL 1211283, at *4 (W.D.N.Y. Mar. 29, 2016) (restriction to "'simple, repetitive, and routine tasks' account[ed] for Plaintiff's limitations [in] maintaining attention and concentration, performing activities within a schedule, and maintaining regular attendance"); *Sipe v. Astrue*, 873 F. Supp. 2d 471, 478, 481 (N.D.N.Y. 2012) (finding that moderate limitations in "relating to instructions, concentration, attendance" were consistent with unskilled work involving "simple and some detailed tasks").  If the RFC's restrictions accommodate "moderate" limitations in these areas, they surely accommodate the "mild" restrictions in Dr. Villani's opinion.  Furthermore, although the VE testified that if Plaintiff was off task for more than five percent of the workday she would be precluded from work, (R. 59-60), Dr. Villani never opined that Plaintiff would be off task for more than five percent of the workday.  As a result, Plaintiff's argument that this opinion "describe[s] an individual that would be off task well more than 5% of the time," (Docket No. 14 at 16), and therefore unemployable, is impermissibly speculative. *See Kya M.*, 2020 WL 7296849, at *6; *see also Swanson v. Comm'r of Soc. Sec.*, No. 1:18-CV-00870 EAW, 2020 WL 362928, at *5 (W.D.N.Y. Jan. 21, 2020).

It is ultimately the claimant's burden to prove that Plaintiff should have a more restrictive RFC than the one assessed by the ALJ. *See Smith v. Berryhill*, 740 F. App'x 721, 726 (2d Cir. 2018) (summary order).  For the reasons stated above, the ALJ reasonably concluded that

-32-

Plaintiff failed to meet her burden, and properly weighed Dr. Villani's opinion to assess an RFC

consistent with Plaintiff's mental functional limitations on record. *See id.*; *Kya M.*, 2020 WL

7296849, at *6.

### 3. Dr. Kamin

The Court reaches the same conclusion with regard to Dr. Kamin's findings.  "An ALJ is

entitled to rely on the opinions of … non-examining State agency medical consultants [such as

Dr. Kamin] because they are qualified experts in the field of social security disability." *Bump v.*

*Comm'r of Soc. Sec.*, No. 5:15-CV-1077 (GTS), 2016 WL 6311872, at *4 (N.D.N.Y. Oct. 28,

2016).  However, "[t]he general rule is that . . . reports of medical advisors who have not

personally examined the claimant deserve little weight in the overall evaluation of disability."

*Vargas v. Sullivan*, 898 F.2d 293, 295 (2d Cir. 1990).  In addition, as with consultative findings,

it is proper to allocate less weight to such opinions when they are inconsistent with the record as

a whole. *See Freegard v. Comm'r of Soc. Sec.*, No. 1:14-cv-34-jgm-jmc, 2015 WL 471703, at *6

(D. Vt. Feb. 4, 2015); *see also Torres v. Berryhill*, No. 3:18-cv-961 (VAB), 2019 WL 3981591,

at *15 (D. Conn. Aug. 23, 2019).

Here, Dr. Kamin's June 2016 assessment allocated "significant weight" to Dr. Villani's

findings, and was also based on then-current treatment records from BRMC and Plaintiff's

function report from May 2016. (R. 69-73).  Like Dr. Villani, Dr. Kamin found moderate

limitations in understanding, remembering, and carrying out very short and simple instructions,

remembering locations and work-like procedures, getting along with peers or coworkers, and

interacting appropriately with the general public. (R. 73-75).  Dr. Kamin also opined that

Plaintiff was moderately limited in performing at a consistent pace, maintaining attention and

concentration for extended periods, and completing a normal workday and workweek without

interruptions from psychologically-based symptoms; as well as markedly limited in

understanding, remembering and carrying out detailed instructions. (R. 74). However, Plaintiff was not significantly limited in sustaining an ordinary routine without special supervision, making simple work-related decisions and working in coordination with or in proximity to others without distraction. (*Id.*). Furthermore, Dr. Kamin assessed no limitations in performing within a schedule, maintaining regular attendance and being punctual within customary tolerances. (*Id.*). Dr. Kamin found Plaintiff capable of simple, unskilled work in a setting with low contact with the general public. (R. 75-76).

The ALJ gave "little weight" to Dr. Kamin's detection of "moderate difficulties" in activities of daily living, maintaining social functioning and maintaining concentration, persistence and pace. (R. 19). To support her reasoning, the ALJ stated that Dr. Kamin's assessment "did not consider recent evidence." (*Id.*). For example, it was "inconsistent" with March 2018 treatment records "stating that the claimant was stable and did not require psychiatric hospitalization." (*Id.*). As another example, it was "inconsistent" with the December 2018 treatment notes reflecting that Plaintiff denied hopelessness, suicidal thoughts or any other psychiatric problems. (*Id.*). The ALJ also engaged in a detailed analysis of further treatment notes and Plaintiff's function report earlier in her decision, concluding that the record demonstrated "controlled symptoms" such that Plaintiff could perform "unskilled work." (R. 17-19).

This determination was supported by substantial evidence for several reasons. First, as with Dr. Villani's findings, the ALJ was entitled to allocate limited weight to Dr. Kamin's conclusions given Plaintiff's improved symptoms and the relatively normal cognitive findings demonstrated by the full universe of treatment notes.[15] *See Freegard*, 2015 WL 471703, at *6.

---

[15] The Court notes that the ALJ mischaracterized the treatment records from March 2018, stating that they showed "that the claimant was stable and did not require psychiatric hospitalization," (R. 19), when the document containing

-34-

Moreover, because Dr. Kamin primarily relied on Dr. Villani's assessment, which the ALJ properly afforded limited weight, it is only logical that the ALJ afforded the same weight to Dr. Kamin's report. *Cf. Torres*, 2019 WL 3981591, at *14–15.

In addition, Plaintiff fails to establish that the RFC is inconsistent with Dr. Kamin's findings. (*See* Docket No. 14 at 16). As previously noted, the RFC sufficiently accounts for moderate limitations in performing and remembering simple tasks because it requires four-step, simple processes and training by demonstration. *See Phifer*, 2020 WL 1032433, at *7; *Buscemi*, 2014 WL 4772567, at *14. Although Dr. Kamin did not find any limitations in maintaining a schedule, the RFC accommodates moderate difficulties in this area, as well as related difficulties in maintaining concentration, persistence or pace, because it requires simple tasks only occasionally involving supervision. *See Kya M.*, 2020 WL 7296849, at *5; *Shannon*, 2018 WL 6592181, at *3. Moreover, Dr. Kamin's report does not indicate that Plaintiff would be off task "well more than 5% of the time," nor did Dr. Kamin opine that Plaintiff is disabled, as Plaintiff claims. *See Kya M.*, 2020 WL 7296849, at *6; (Docket No. 14 at 16). Rather, Dr. Kamin found that Plaintiff was "capable of meeting the basic mental demands of simple, unskilled work in a setting with low contact with the general public," (R. 75-76), which is what the RFC reflects, (R. 16, 20).

To the extent that Plaintiff argues that the RFC fails to account for Dr. Kamin's finding of moderate restrictions in activities of daily living, (*see* Docket No. 14 at 16), the Court finds that the ALJ did not err in this regard. An ALJ need not "adopt each and every finding" in a

---

these findings was a November 2011 progress note attached to the March 2018 records, (R. 528). However, this mischaracterization was harmless because there was substantial evidence in the form of other treatment notes – from both before and after the relevant period – reflecting this same conclusion. *See Sepa v. Saul*, No. 19-CV-1658 (VEC), 2020 WL 4048668, at *2 (S.D.N.Y. July 20, 2020); *Jessica E. v. Saul*, No. 5:18-CV-543 (CFH), 2019 WL 3776157, at *8 (N.D.N.Y. Aug. 12, 2019); (*see also* R. 733, 735, 737).

medical source opinion. *See Fisher v. Colvin*, No. 514CV1498 (MAD/DJS), 2016 WL 8677160, at *10 (N.D.N.Y. Mar. 11, 2016), *report and recommendation adopted*, 2016 WL 1248900 (N.D.N.Y. Mar. 29, 2016); *see also Matta*, 508 F. App'x at 56.  Furthermore, the ALJ's analysis makes clear that she discounted Plaintiff's claims of disabling symptoms because, as explained above in Section II.C.1., neither Plaintiff's reported activities of daily living nor clinical findings from the treatment records were in line with those claims. *See Christina M. v. Saul*, No. 3:18-CV-0332 (CFH), 2019 WL 3321891, at *7 (N.D.N.Y. July 24, 2019); (R. 16-19).

As a result, Plaintiff has not met her burden of showing a need for a more restrictive RFC based on Dr. Kamin's opinion. *See Smith*, 740 F. App'x at 726.  The ALJ's decision to afford Dr. Kamin's opinion limited weight was consistent with the record as a whole, *cf. Freegard*, 2015 WL 471703, at *6, and any error in this determination was harmless because the RFC adhered to most of Dr. Kamin's observations, *see Kya M.*, 2020 WL 7296849, at *6.

The Court therefore finds no error in the ALJ's treatment of any of the opinion evidence, and that the RFC is supported by substantial evidence.

## D.  Duty to Develop the Record

Plaintiff alleges that the ALJ failed to develop the record by (1) failing to obtain an updated consultative examination from after the amended alleged disability onset date; (2) failing to order an I.Q. test to determine Plaintiff's cognitive abilities; and (3) failing to request a consultative examination regarding the functional limitations of Plaintiff's left wrist fracture. (Docket No. 14 at 20-22).  Plaintiff further contends that because the ALJ afforded "little weight" to all three opinions, the ALJ's decision was not based on medical expertise. (*Id.* at 18). Defendant contends that the ALJ was under no obligation to further supplement the consultative findings. (Docket No. 16 at 19-20, 24 n.6).  The Court finds that the ALJ had enough evidence to

make a disability determination without any further psychiatric or intelligence examinations.  In addition, the treatment notes indicate that Plaintiff's left wrist fracture was fully healed, required only conservative treatment, and was relatively minor so that the ALJ could render a common-sense judgment of Plaintiff's RFC.

In the Second Circuit, "the ALJ, unlike the judge in a trial, must [her]self affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Pratts*, 94 F.3d at 37 (quoting *Echevarria v. Sec'y of Health and Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)) (alteration in original).  This affirmative duty requires the ALJ to ensure a complete record of the plaintiff's medical history "'even when the claimant is represented by counsel or . . . by a paralegal.'" *Rosa*, 168 F.3d at 79 (quoting *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996)).  "Whether the ALJ has satisfied this obligation or not must be addressed as a threshold issue." *Moreau v. Berryhill*, No. 3:17-CV-396 (JCH), 2018 WL 1316197, at *4 (D. Conn. Mar. 14, 2018).

In light of the ALJ's duty, as well as the treating physician rule, "an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." *Rosa*, 168 F.3d at 79.  Moreover, the ALJ generally may not "simply . . . secure raw data from the treating physician" without requesting an accompanying opinion. *See Hallett v. Astrue*, No. 3:11-cv-1181 (VLB), 2012 WL 4371241, at *6 (D. Conn. Sept. 24, 2012).  This is because an ALJ may not engage in a lay interpretation of the medical evidence without guidance from a person with relevant expertise. *See Davis v. Comm'r of Soc. Sec.*, No. 5:16-CV-0657 (WBC), 2017 WL 2838162, at *7 (N.D.N.Y. June 30, 2017).   Therefore, an ALJ's assessment of the plaintiff's condition without seeking an opinion from a treating source can constitute harmful error. *Alamo v. Berryhill*, No. 3:18-CV-00210 (JCH), 2019 WL 4164759, at *6 (D. Conn. Sept.

3, 2019).  However, "'courts in this District have found that it is not *per se* error for an ALJ to make a disability determination without having sought the opinion of the claimant's treating physician.'" *Hill Ogletree v. Saul*, 19 Civ. 7208 (JCM), 2020 WL 3171355, at *10 (S.D.N.Y. June 15, 2020).

### 1.  Record of Mental Impairments

### i.  Duty to Recontact Dr. Marrero-Figarella

With regard to the record of mental health evidence, the ALJ was not obligated to recontact Dr. Marrero-Figarella because he was not a treating physician during the period of alleged disability. *See Perez*, 77 F.3d at 47–48; *see also Monette*, 269 Fed. App'x. at 112. Plaintiff is correct that "[w]here the record contains a treating physician's opinion, but the opinion is incomplete, unclear, or inconsistent, the ALJ's duty to develop the record requires the ALJ to seek additional information" before rejecting the opinion. *See Campbell v. Saul*, No. 19CV181 (PAE)(JLC), 2020 WL 486862, at *27 (S.D.N.Y. Jan. 30, 2020).  However, the duty to recontact does not apply where the opinion at issue does not come from a treating physician. *See Perez*, 77 F.3d at 47–48; *Lefever v. Astrue*, No. 5:07-CV-622 (NAM/DEP), 2010 WL 3909487, at *8 (N.D.N.Y. Sept. 30, 2010), *aff'd*, 443 F. App'x 608 (2d Cir. 2011).  Because the Court has already determined that Dr. Marrero-Figarella's opinion does not come within the scope of the treating physician rule, *see supra* Section II.C.1., the ALJ did not commit error by failing to seek an updated assessment from him. *See Perez*, 77 F.3d at 47–48.

Even if the treating physician rule applied, under the regulations in force at the time of ALJ Addison's decision, she was not specifically required to recontact Dr. Marrero-Figarella in light of any evidentiary gaps. *See Wettlaufer v. Colvin*, 203 F. Supp. 3d 266, 281 & n.1 (W.D.N.Y. 2016).  Rather, the regulations permit the ALJ to take other actions, such as simply requesting additional evidence or ordering a consultative examination. *See* 20 C.F.R. §

404.1520b(b)(2) (noting that where the record is either insufficient or inconsistent, additional

actions "*may* need" to be taken, including "recontact[ing the] medical source"; "request[ing]

additional existing evidence"; "ask[ing claimant] to undergo a consultative examination"; or

"ask[ing claimant] or others for more information") (emphasis added).  Here, the ALJ complied

with these regulations because she secured a consultative examination, and beyond Plaintiff's

conclusory statements, there is no further indication that the record is incomplete. *See Wettlaufer*,

203 F. Supp. 3d at 281 (noting that ordering a consultative examination "is a permissible option

for addressing insufficiency or inconsistency in the record").

### ii.  Additional Consultative Examination

The Court is also not persuaded by Plaintiff's arguments that a further consultative

examination was required.  "A consultative examination is used to 'try to resolve an

inconsistency in the evidence, or when the evidence as a whole is insufficient to allow [the ALJ]

to make a determination or decision' on the claim." *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x

29, 32 (2d Cir. 2013) (summary order) (quoting 20 C.F.R. §§ 404.1519a(b), 416.919a(b)).  The

record is insufficient "when it does not contain all of the information [ ] need[ed] to make [a]

determination or decision." 20 C.F.R. § 404.1520b(b).  "However, an ALJ is not required to

order a consultative examination if the facts do not warrant or suggest the need for it." *Tankisi*,

521 F. App'x at 32.

First, the mere fact that the three subject opinions were rendered before the relevant

period did not trigger any further duty to develop the record. *See Rosa v. Comm'r of Soc. Sec.*,

No. 17 Civ. 3344 (NSR)(JCM), 2018 WL 5621778, at *10 (S.D.N.Y. Aug. 13, 2018).

Consultative examinations do not have expiration dates. *See id.*; *Frazier v. Comm'r of Soc. Sec.*,

No. 16 Civ. 4320 (AJP), 2017 WL 1422465, at *16 (S.D.N.Y. Apr. 20, 2017).  "The . . . passage

of time does not render an opinion stale[;] [i]nstead, a medical opinion may be stale if

subsequent treatment notes indicate a claimant's condition has deteriorated." *Whitehurst v. Berryhill*, 1:16-cv-01005-MAT, 2018 WL 3868721, *4 (W.D.N.Y. Aug. 14, 2018); *accord Best v. Berryhill*, 1:17-CV-00795(JJM), 2019 WL 1146341, *3 (W.D.N.Y. Mar. 13, 2019) ("The relevant issue is whether plaintiff's condition *deteriorated* during th[e] period [at issue].") (emphasis in original).  "A more remote medical opinion may in fact constitute substantial evidence if it is consistent with the record as a whole." *Marozzi v. Berryhill*, No. 6:17-cv-06864-MAT, 2019 WL 497629, at *7 (W.D.N.Y. Feb. 8, 2019).  Apart from conclusory assertions, Plaintiff does not identify any evidence that her condition deteriorated after Dr. Villani's examination or during the relevant period. *See Beckles v. Comm'r of Soc. Sec.*, No. 18-CV-321P, 2019 WL 4140936, at *6 (W.D.N.Y. Aug. 30, 2019).  To the contrary, the record demonstrates that her symptoms were generally well-controlled and improved over time, which the ALJ considered in her analysis. *See id.*; *Ambrose-Lounsbury v. Saul*, No. 18-CV-240, 2019 WL 3859011, at *3–4 (W.D.N.Y. Aug. 16, 2019); (R. 17-19).  Although Plaintiff was observed as having heightened depressive symptoms in January 2018 after a period without treatment, (R. 725), they did not resurface for the rest of the alleged period of disability, (R. 727, 729, 731, 733, 735, 737, 739, 741).  Absent any significant developments in Plaintiff's medical history indicating worsening conditions, Plaintiff has not shown that the opinions of record are stale warranting further factual development. *See Ambrose-Lounsbury*, 2019 WL 3859011, at *3–4.

Plaintiff's belated contention that additional opinion evidence was required because "all of the expert opinions . . . seemed inconsistent with the medical records" fares no better. (Docket No. 17 at 2).  "It is well established in this Circuit that 'where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits

claim.'" *Jennings v. Colvin*, No. 13–CV–834, 2014 WL 3748574, at *5 (W.D.N.Y. July 29,

2014) (quoting *Rosa*, 168 F.3d at 79 n.5).  An ALJ is not required to recontact a treating

physician, or other medical source, simply because the "medical evidence is conflicting or

internally inconsistent." *Micheli v. Astrue*, 501 F. App'x. 26, 29–30 (2d Cir. 2012) (summary

order); *see also* 20 C.F.R. § 404.1520b(b)(1).  "Rather . . . the ALJ will weigh all of the evidence

and see whether [he or she] can decide whether a claimant is disabled based on the evidence he

[or she] has, even when that evidence is internally inconsistent." *Micheli*, 501 F. App'x. at 29-30.

An ALJ is only required to recontact "if the records received were 'inadequate . . . to determine

whether [Plaintiff was] disabled.'" *Brogan–Dawley v. Astrue*, 484 F. App'x. 632, 634 (2d Cir.

2012) (summary order) (quoting *Perez*, 77 F.3d at 47).

　　　　Plaintiff fails to establish that the ALJ lacked a "complete medical history" and therefore

had insufficient information to make a disability determination. *See Jennings*, 2014 WL

3748574, at *5.  In addition to the subject opinions – which, as previously explained, the ALJ

largely incorporated into the RFC – the ALJ was equipped with treatment notes from Plaintiff's

primary care physician both before and after the relevant period observing intermittent

depressive symptoms, (R. 639, 645, 651), which were consistent with psychiatric notes from

BRMC, (*e.g.*, R. 685, 689, 697, 723, 725, 727, 729).  Plaintiff does not identify any gaps in these

treatment notes. (*See generally* Docket Nos. 14, 17).  The evidence was therefore adequate to

allow the ALJ to make a determination as to Plaintiff's disability. *See, e.g.*, *Pellam*, 508 F.

App'x. at 90 (upholding RFC determination where aspects of consultative opinion were rejected

but ALJ relied on clinical findings and treatment notes); *Lowry v. Astrue*, 474 F. App'x 801,

804–05 (2d Cir. 2012) (holding that ALJ "satisfied his duty [to develop the record] by obtaining

[plaintiff's] complete medical history, which consisted of extensive patient treatment records

prepared by numerous healthcare providers") (summary order); *Lefever*, 2010 WL 3909487, at

*7–8 (declining to order further opinion where "[p]laintiff ha[d] not alleged that there [we]re

gaps in [her] medical history and . . . [t]he evidence received from the treating physicians was

adequate and allowed the ALJ to make a determination as to disability").

This is so even though the ALJ did not order an I.Q. test to supplement Plaintiff's score

from 1975. (Docket No. 14 at 20-21).  Where a plaintiff suggests a possible mental impairment,

the ALJ must assess whether there is any evidence of work-related functional limitations

resulting from the possible mental impairment which have not been adequately addressed in the

record. *See Haskins v. Comm'r of Soc. Sec.*, No. 5:05–CV–292 (DNH/RFT), 2008 WL 5113781,

at *7 n.5 (N.D.N.Y. Sept. 11, 2008).  An ALJ's failure to order a consultative examination when

it is required to make an informed decision may constitute harmful error. *See Krach v. Comm'r

of Soc. Sec.*, No. 3:13-CV-1089 GTS/CFH, 2014 WL 5290368, at *9 (N.D.N.Y. Oct. 15, 2014).

However, "if the facts do not warrant or suggest a need for one, the ALJ is within his or her

discretion to decide to not order [it]." *Id.*

Here, an additional I.Q. test was not necessary because the ALJ had sufficient

information to determine Plaintiff's functional limitations from the treatment notes as well as Dr.

Villani and Dr. Kamin's assessments. *See Pellam*, 508 F. App'x at 90; *Washington v. Astrue*, No.

12-cv-39 (GLS), 2012 WL 6044877, at *2–3 (N.D.N.Y. Dec. 5, 2012).  Both assessments

addressed Plaintiff's cognitive deficiencies and the limitations stemming therefrom. (R. 73-74,

366-67).  Although Dr. Villani concluded that Plaintiff was cognitively deficient, (R. 366), both

experts assessed no more than moderate difficulties understanding and implementing simple

instructions, maintaining attention, concentration and pace, and learning new tasks. (R. 73-74,

368).  Indeed, Dr. Kamin found that Plaintiff was "capable of meeting the basic mental demands

of simple, unskilled work." (R. 75-76).  Dr. Villani also explicitly considered Plaintiff's language

deficits, yet did not diagnose Plaintiff with a learning disorder or any specific cognitive

impairment. (R. 366, 368).  The ALJ was also aware of Plaintiff's education level, learning

disorder, childhood I.Q. score, language issues, struggles with reading and previous work as a

babysitter. (R. 16-18, 20, 50).

       In light of the consistent evidence that Plaintiff's cognitive deficiencies did not preclude

her from unskilled, simple work, the ALJ had enough information to make a finding without an

additional I.Q. examination. *See, e.g.*, *Coley v. Berryhill*, No. 6:17-cv-06886-MAT, 2019 WL

315256, at \*3 (W.D.N.Y. Jan. 24, 2019), *appeal withdrawn*, No. 19-654, 2019 WL 4409700 (2d

Cir. July 11, 2019) (finding record sufficient absent current intelligence testing because

consultative examiner "did not assign any nonexertional limitations that would preclude

Plaintiff's ability to perform simple, unskilled work, notwithstanding examiner's finding of

'possible limited intellectual functioning'"); *Krach*, 2014 WL 5290368, at \*9 (finding additional

consultative examination unnecessary where consultative examiner noted cognitive deficits but

did not assign specific cognitive impairment, and record indicated that ALJ was aware of

claimant's educational level and struggles with writing and reading); *McDowell v. Colvin*, No.

11-CV-1132 (NAM/VEB), 2013 WL 1337152, at \*4–5 (N.D.N.Y. Mar. 11, 2013) (no remand

required absent consultative intelligence examination because plaintiff had home health aide

certificate and worked part-time for over three years, which constituted evidence of intellectual

capacity to perform basic work activities); *Washington*, 2012 WL 6044877, at \*2–3 (finding no

error in failure to order consultative intelligence examination where consultative psychologist

reported that despite borderline to low average intellectual functioning, plaintiff could follow and understand simple directions and maintain attention and concentration "fairly well").[16]

Finally, the Court rejects Plaintiff's contention that the ALJ impermissibly based the RFC assessment on her own lay opinion by affording limited weight to all three opinions of record. (Docket No. 14 at 18). "An ALJ does not necessarily 'reject' opinion evidence when the opinion is assessed less than controlling weight and where, as here, it is evident that the ALJ's RFC determination incorporates limitations contained in that opinion." *Cook v. Comm'r of Soc. Sec.*, No. 18-CV-0726MWP, 2020 WL 1139909, at *4 (W.D.N.Y. Mar. 9, 2020). This is not a situation where the ALJ wholly rejected the only medical opinion and then proceeded to fashion an RFC for a non-minor impairment based on no medical assessment of Plaintiff's functional limitations. *See Raymonda C. v. Comm'r of Soc. Sec.*, No. 3:19-CV-0178 (GTS), 2020 WL 42814, at *5–6 (N.D.N.Y. Jan. 3, 2020); *cf. House v. Astrue*, No. 5:11-CV-915 (GLS), 2013 WL 422058, at *4 (N.D.N.Y. Feb. 1, 2013). Rather, the ALJ's RFC determination clearly incorporated the majority of the "mild" and "moderate" limitations identified by Dr. Kamin and Dr. Villani by limiting Plaintiff to simple tasks with up to four-step processes, requiring training demonstration, and foreclosing more than occasional interaction with supervisors and the public. *See Cook*, 2020 WL 1139909, at *3–5; *supra* Section II.C.2, 3. Therefore, the ALJ's RFC determination is supported by medical opinion evidence and is not the product of the ALJ's own lay interpretation of the medical data. *See Mathews*, 2020 WL 4352620, at *9 (finding no error where ALJ assigned "little weight" to all opinions regarding mental impairments but RFC "[wa]s

---

[16] In a single footnote, Plaintiff contends that her low I.Q. score from 1975 "is consistent with the fact that although [she] is over 50 years old," she never engaged in substantial gainful activity. (Docket No. 14 at 22 n.5). However, this statement is inconsistent with the record, which indicates that Plaintiff worked at substantial gainful activity levels prior to the alleged onset date. (R. 289). In any event, because Plaintiff does not advance this contention anywhere else in her submissions, nor explain its relevance, the Court declines to address it further. *See Cunningham v. Comm'r of Soc. Sec.*, No. 17-CV-1135-FPG, 2019 WL 2059213, at *4 n.3 (W.D.N.Y. May 9, 2019).

consistent with and incorporate[d] many aspects" of one opinion); *see also Pellam*, 508 F. App'x at 90.

Under these circumstances, given the absence of evidence indicating any worsening of Plaintiff's condition that would render the opinions stale, and the fact that the ALJ incorporated many aspects of two of these opinions, the ALJ's decision not to obtain an updated consultative examination was not erroneous.

### 2. Additional Consultative Examination Regarding Physical Impairments

Plaintiff argues that "the ALJ should have requested that [she] undergo a physical consultative examination to determine the extent of limitations plaintiff has as a result of her left wrist injury." (Docket No. 14 at 21).  That is the extent of Plaintiff's argument.[17]  However, it is not *per se* error to craft an RFC without a physical consultative examination when the record "contains sufficient evidence to permit the ALJ to render a common-sense RFC determination." *Morrill v. Saul*, 19-CV-6279F, 2020 WL 5107567, at *4 (W.D.N.Y. Aug. 31, 2020) (citing *Monroe*, 676 F. App'x at 6–9).  Such a situation exists when "the medical records . . . show[] relatively minor impairments" that are not "disabling," *Dagonese v. Comm'r of Soc. Sec.*, No. 18-CV-1021-MJR, 2020 WL 3046146, at *5 (W.D.N.Y. June 8, 2020), rather than non-benign, "complex medical findings" that cannot be interpreted by a lay person, *see Dale v. Colvin*, 15-CV-496-FPG, 2016 WL 4098431, at *4 (W.D.N.Y. Aug. 2, 2016), or resolved with non-conservative treatment. *Compare Brown v. Apfel*, 174 F.3d 59, 63 (2d Cir. 1999) (remanding where ALJ decided that plaintiff's "seizures were caused by a failure to take his medication" when no treatment provider said so); *with Dagonese*, 2020 WL 3046146, at *3–5 (ALJ properly made "common sense judgment" in light of "negative left ankle x-rays" and "conservative

---

[17] *See Cunningham*, 2019 WL 2059213, at *4 n.3; *supra* n.16.

measures for relief"); *Pinkowski v. Comm'r of Soc. Sec.*, No. 1:19-CV-00173 EAW, 2020 WL 1969312, at *4, *6 (W.D.N.Y. Apr. 24, 2020) (finding no need for medical assessment where "back and shoulder pain . . . caused . . . little to no functional limitations" and diagnostic imaging was "benign").

Here, Plaintiff's left wrist fracture was fully healed, required only conservative treatment and was sufficiently "minor" to permit the ALJ to render an RFC without seeking a further opinion. *See Dagonese*, 2020 WL 3046146, at *3–5.  In late December 2017, Plaintiff was diagnosed with "acute" pain of the left wrist and an X-ray showed a non-displaced fracture, requiring only a removable brace. (R. 645, 683).  A further X-ray in March 2018, showed an old, healed fracture, with no other abnormalities. (R. 513).  At that time, Dr. Dubey observed minimal left wrist tenderness, increased flexion and extension to forty degrees, and no block to pronation or supination. (R. 454).  In May 2018, Dr. Dubey directed Plaintiff to discontinue use of the brace to avoid additional stiffness and weakness. (R. 477-78).  In July 2018, Dr. Dubey noted "minimal discomfort . . . with deep palpation of the dorsal aspect of the radiocarpal joint." (R. 490).  By November 2018, Plaintiff reported no pain whatsoever, and exhibited no swelling or limitation in motion. (R. 655).  Dr. Calderon discontinued her prescriptions of naproxen, acetaminophen and gabapentin. (*Id.*).  A November 28, 2018 letter indicates that Plaintiff was still in physical therapy as of the hearing, (R. 555), but there is no evidence that Plaintiff required continued treatment from Dr. Dubey after July 2018.

The ALJ found that this evidence "suggest[ed] only manipulative limitations" with Plaintiff's left hand, correctly noting that Dr. Dubey discontinued prescription of the splint and the X-ray evidence of a "healed fracture." (R. 17).  Whereas the ALJ acknowledged Plaintiff's reduced range of motion, she concluded that her wrist was "able to heal and improve in

symptoms within less than a year after fracturing," as in July 2018, Plaintiff only demonstrated "minimal discomfort" with "deep palpation," without nerve damage. (R. 17, 490).[18]  The ALJ noted that during the hearing, Plaintiff testified that she could open mail, sometimes with her daughter's help, use a cellphone, and write with her right hand. (R. 17, 47, 52).[19]  The ALJ also determined that Plaintiff's further statements as to the severity of her symptoms were not credible. (R. 16-17, 19).

Given the X-rays indicating that the fracture healed, Plaintiff's steady improvement with physical therapy, and her intermittent reports of non-acute pain in the more recent progress notes, the Court cannot conclude that the ALJ erred. *See Dagonese*, 2020 WL 3046146, at *4–5; *Pinkowski*, 2020 WL 1969312, at *4–6.  The ALJ's RFC credited many of the limitations documented in the treatment notes, permitting "frequent fingering and handling with the non-dominant left hand." (R. 16); *see also Dagonese*, 2020 WL 3046146, at *5.  This was supported by Plaintiff's intact left finger flexion and extension, increased wrist motion over time, and continued limitations in bearing weight and grip strength. (R. 440, 446, 459, 490, 495).  Moreover, less than one year after the injury, her brace and various medications were discontinued, and her wrist was normal upon a musculoskeletal examination. *See Borck v. Comm'r of Soc. Sec.*, No. 18-CV-1183 HBS, 2020 WL 1226885, at *2–3 (W.D.N.Y. Mar. 13,

---

[18] The ALJ incorrectly stated that the July 2018 occupational therapy notes evidenced "mild discomfort" when these notes documented "severe" pain. (R. 17, 496).  However, any error was harmless because the ALJ correctly cited Dr. Dubey's notes from that same month, which reflect a "minimal" amount of pain. (R. 17, 490); *see also Sepa*, 2020 WL 4048668, at *2.  Furthermore, as explained in note 7, *supra*, the "severe" pain observed by OTA Haynes appears to have been copy-and-pasted from the February 2018 occupational therapy notes.

[19] The ALJ also referenced the activities of daily living in Plaintiff's function report as further evidence to support the RFC. (R. 17).  To the extent that the ALJ relied on the report to evaluate the limitations in Plaintiff's left wrist, that determination was erroneous, as Plaintiff completed it before the injury occurred. *See Fox v. Berryhill*, No. 16-2150, 2017 WL 2906088, at *3 (C.D. Ill. June 16, 2017).  However, such error was harmless because the progress notes evidencing minimal limitations after the fracture healed constitute substantial evidence supporting the RFC. *See Anthony Joseph C. v. Comm'r of Soc. Sec.*, No. 5:18-CV-793 (ATB), 2019 WL 2995169, at *12 n.10 (N.D.N.Y. July 9, 2019) (ALJ's misinterpretation of evidence was "harmless error as substantial evidence supported . . . RFC").

2020); (R. 655).  Therefore, the Court finds that "more detailed medical source statements were

not necessary" and it would be inappropriate to remand solely because the ALJ failed to request

a medical opinion in assessing the RFC. *See Borck*, 2020 WL 1226885, at *3.

### E.  Plaintiff's Language Skills

Plaintiff finally alleges that the ALJ erred in finding that she had the requisite language

skills to find work in the national economy. (Docket No. 14 at 18-20).  According to Plaintiff,

there is insufficient evidence to demonstrate that she can perform the jobs recommended by the

VE because they all require a Language Development Level of 1 ("Level 1" or "Language Level

1"), which is inconsistent with her cognitive deficits. (*Id.*).  The Commissioner responds that

substantial evidence supports the ALJ's determination because Plaintiff was capable of unskilled

work. (Docket No. 16 at 25-27).  The Court finds that although Plaintiff's language deficiencies

are well-documented, there is sufficient evidence to demonstrate that she can perform the subject

jobs at Level 1, the most basic Language Level in the D.O.T.

Language skills are evaluated as a vocational factor of education at step five of the

sequential evaluation. *See Yulfo-Reyes v. Berryhill*, No. 3:17CV02015(SALM), 2018 WL

5840030, at *10 (D. Conn. Nov. 8, 2018).  Although the claimant has the general burden to

prove he or she has a disability under the definitions of the Social Security Act, the burden shifts

to the Commissioner at step five "to show there is other work that [the claimant] can perform."

*McIntyre*, 758 F.3d at 150 (quoting *Brault*, 683 F.3d at 445). "An ALJ may rely on a vocational

expert's testimony regarding a hypothetical as long as 'there is substantial record evidence to

support the assumption[s] upon which the vocational expert based his opinion' [and] . . . [the

hypothetical] accurately reflect[s] the limitations and capabilities of the claimant involved."

*McIntyre*, 758 F.3d at 151 (quoting *Dumas v. Schweiker*, 712 F.2d 1545, 1553–54 (2d Cir.

1983)).  "If a hypothetical does not include all of a claimant's impairments, limitations and

restrictions, or is otherwise inadequate, a VE's response cannot constitute substantial evidence to support a finding of no disability." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 211 (W.D.N.Y. 2009).

The regulations separate language skills into two components: literacy and communication. *See Yulfo-Reyes*, 2018 WL 5840030, at *10 (citing 20 C.F.R. § 416.964 (2020)).[20]  Whereas "illiteracy" is defined as the "inability to read or write," the "inability to communicate in English is a separate educational factor that the SSA may consider." *See Afari v. Berryhill*, No. 16-CV-595-FPG, 2017 WL 1963583, at *3 (W.D.N.Y. May 12, 2017) (quoting 20 C.F.R. § 416.964(b)(1), (5)).  A person is classified as illiterate "if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name." 20 C.F.R. § 416.964(b)(1).  As to the ability to communicate in English, the regulations state: "Since the ability to speak, read and understand English is generally learned or increased at school, we may consider this an educational factor." *Id.* § 416.964(b)(5).

The D.O.T. defines all three jobs cited by the VE as requiring Level 1[21] language capabilities, the lowest of six language levels. *See 520.685-050 Candy-Maker Helper*, Dictionary of Occupational Titles, 1991 WL 673995 (4th ed. 1991); *920.687-018 Bagger*, *id.*, 1991 WL 687965; *920.587-018, Packager, Hand*, *id.*, 1991 WL 687916; Appendix C – Components of the Definition Trailer, *id.*, 1991 WL 688702.  Level 1 requires a combination of basic reading,

---

[20] The Social Security Administration has updated its rules to remove "inability to communicate in English" as an education category for cases filed from April 27, 2020 forward. *See* Removing Inability To Communicate in English as an Education Category, 85 Fed. Reg. 10586-01 (Feb. 25, 2020).  However, "inability to communicate in English" remains the correct standard here, as the ALJ rendered her decision on January 15, 2019, (R. 10-21), and courts within this Circuit traditionally apply the version of the rules in effect "when the ALJ adjudicated [the subject] disability claim." *See Lowry*, 474 F. App'x at 804 n.2 (summary order); *see also Estrada v. Comm'r of Soc. Sec.*, No. 18-cv-3530(KAM), 2020 WL 3430680, at *7 n.1 (E.D.N.Y. June 23, 2020).

[21] Each job description in the D.O.T. includes General Educational Development ("GED") levels rated between "1" and "6" pertaining to reasoning, mathematical and language development. *See* Appendix C–Components of the Definitional Trailer, *id.*, 1991 WL 688702.  The GED levels "describe the general educational background that makes an individual suitable for a particular job." *Vandermark v. Colvin*, No. 3:13-cv-1467 (GLS/ESH), 2015 WL 1097391, at *9 n.19 (N.D.N.Y. Mar. 11, 2015).

writing and speaking. *See* Appendix C – Components of the Definition Trailer, Dictionary of

Occupational Titles, 1991 WL 688702.[22]  Although not stated in the D.O.T., courts have noted

that Language Level 1 corresponds with a third grade reading level. *See Slack v. Colvin*, No.

1:14-CV-00200 (MAT), 2016 WL 556358, at *4 (W.D.N.Y. Feb. 12, 2016); *Matthews v.

Comm'r of Soc. Sec.*, No. 1:13–cv–195, 2014 WL 5392991, at *9 (D. Vt. Oct. 23, 2014).

      Here, although there is conflicting evidence regarding Plaintiff's language abilities, there

is enough to support the ALJ's finding that she could perform unskilled work involving minimal

communication and literacy skills. *See Schaal*, 134 F.3d at 504 ("It is for the SSA, and not this

court, to weigh the conflicting evidence in the record.").  On the one hand, Plaintiff was in

special education through the eleventh grade and received an I.Q. score of 51 when she was ten

years old. (R. 365, 548).  She testified that she "d[id not] know how to read," and needed her

daughter's help reading because she "d[id not] understand sometimes." (R. 54).  During

Plaintiff's field office interview, Plaintiff had difficulty reading, answering and understanding, as

well as spelling the names of her medications and remembering. (R. 295).

      On the other hand, in her initial disability report, Plaintiff indicated that she could read

and understand English and that she could write more than her name in English. (R. 287).  She

also stated that she completed the report herself. (R. 288).  Similarly, Plaintiff also indicated that

---

[22] Specifically, it involves:

    Reading: Recognize meaning of 2,500 (two- or three-syllable) words. Read at rate of 95-120
    words per minute. Compare similarities and differences between words and between series of
    numbers.

    Writing: Print simple sentences containing subject, verb, and object, and series of numbers,
    names, and addresses.

    Speaking: Speak simple sentences, using normal word order, and present and past
    tenses.

*Id.*

she completed her function report on her own, which contained full handwritten sentences in print. (R. 297-305).  In the report, Plaintiff described being able to converse on the phone and socialize, count change, handle a savings account, and use public transportation. (R. 300-02).  Plaintiff also declined the assistance of an interpreter at the hearing and testified that she cared for young children as a babysitter until 2017. (R. 40-41, 46-47, 53-54).  She further explained that she stopped babysitting due to her left wrist fracture and increased depression, not because of any cognitive or language deficits. (R. 54).  In light of these activities of daily living, Dr. Kamin opined that Plaintiff was capable of unskilled, simple work. (R. 75-76).  Likewise, although Dr. Villani noted receptive and expressive language deficits, (R. 366), she found Plaintiff only moderately limited in understanding and implementing simple instructions and making work related decisions, (R. 368).

In her decision, the ALJ found that Plaintiff had a "limited education," but was "able to communicate in English," and therefore employable based on the VE's opinion. (R. 20-21).  She also noted Plaintiff's prior work as a babysitter, acknowledged her cognitive deficits, and determined that Plaintiff's testimony regarding the extent of her symptoms was not credible. (R. 16-19).  At the hearing, the VE classified Plaintiff's past position as a babysitter as medium exertional work with an SVP of 3, listed as 301.677-010 in the D.O.T. (*See* R. 58).  She further testified that although a hypothetical individual with Plaintiff's RFC and educational background could no longer perform that job, such an individual could work as a candy maker helper and garment bagger at light exertional levels, as well as a hand packager at medium exertional levels. (R. 59).  The VE reiterated this point when Plaintiff's counsel asked whether the individual could work if he or she could only occasionally understand simple directions. (R. 60-61).

The Court recognizes that Plaintiff may have severe cognitive and/or linguistic impairments that affect her daily life, but on this record, finds that there is substantial evidence to support the ALJ's determination. *See Brault*, 683 F.3d at 448 ("Under the substantial evidence standard, a reviewing court may reject an ALJ's findings of fact 'only if a reasonable factfinder would *have to conclude otherwise.*'") (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis in original).  An ALJ's decision is sufficient where, as here, it is clear from the ALJ's written determination that the ALJ considered conflicting evidence, but simply did not draw the conclusions that Plaintiff thinks he should have. *See Pulos v. Comm'r of Soc. Sec.*, 346 F. Supp. 3d 352, 360–62 (W.D.N.Y. 2018).  In addition, "the standard for literacy [is] . . . low" and "the question is only whether the plaintiff is so deficient in his ability to read and write that he cannot obtain even an unskilled job." *Gross v. McMahon*, 473 F. Supp. 384, 388–89 (W.D.N.Y. 2007) (quoting *Glenn v. Sec'y of Health and Human Servs.*, 814 F.2d 387, 391 (7th Cir. 1987)) (internal quotation marks omitted).

"Because the Commissioner relied on VE testimony to establish that [Plaintiff is employable], the relevant question is whether the hypotheticals posed to the VE were [infected] by an erroneous description of [P]laintiff's educational history and/or literacy level, such that the Commissioner failed to meet his burden to show that there are jobs . . . in the national economy that [P]laintiff can perform." *See Ruiz v. Saul*, 18-CV-6404L, 2020 WL 57197, at *3 (W.D.N.Y. Jan. 3, 2020); *see also McIntyre*, 758 F.3d at 150.  However, Plaintiff has not identified any aspect of the hypothetical posed to the VE that was factually incorrect. (*See generally* Docket No. 14 at 18-20).  Moreover, before the VE gave her opinion, the ALJ noted that Plaintiff finished the eleventh grade and confirmed that the VE was "familiar with [Plaintiff's] vocational background" and had reviewed the relevant exhibits, including those reflecting Plaintiff's

cognitive deficits. (R. 57-58).  Upon further questioning from Plaintiff's counsel, the VE testified

that she had worked with clients with traumatic brain injuries and that the individual from the

ALJ's hypothetical could perform the jobs she referenced even if he or she could only

occasionally understand simple directions. (R. 60-63).  Absent any assertion to the contrary, this

testimony establishes that the hypothetical was based on substantial evidence. *See Dorn v.*

*Berryhill*, No. 16-CV-6635 (JWF), 2018 WL 3321564, at *2 (W.D.N.Y. July 5, 2018) (finding

that substantial evidence supported determination that claimant could perform jobs at Language

Level 1 though hypothetical did not mention limited reading abilities, where counsel failed to

cross-examine the VE regarding reading skills and VE testified that she took language skills into

account); *Molina v. Colvin*, No. c13–CV–6532 CJS, 2014 WL 4955368, at *8 (W.D.N.Y.

October 2, 2014) (ALJ's failure to include illiteracy in RFC was harmless error, where VE

reviewed the exhibits of record and was asked to consider an individual with claimant's

education).

        In addition, even if the hypothetical was faulty, there is substantial evidence to

demonstrate that Plaintiff can perform unskilled, simple work with Level 1 language skills while

having a "limited education," or even while being illiterate. *See Galarza v. Berryhill*, No.

3:18CV00126(SALM), 2019 WL 525291, at *14–17 (D. Conn. Feb. 11, 2019).  The regulations

define "limited education" as "a 7th grade through the 11th grade level of formal education," but

note that "the numerical grade level that [a claimant] completed in school may not represent [his

or her] actual education abilities." 20 C.F.R. § 416.964(b)(3).  Plaintiff completed the eleventh

grade, albeit in special education, filled out the entire function report by herself, and successfully

babysat young children until 2017. *See Jimenez v. Berryhill*, No. 16-CV-3972, 2018 WL

4054876, at *6 (E.D.N.Y. Aug. 24, 2018) (finding that ALJ properly found claimant had

"limited" education with fourth grade education, as he completed his own function report in English and worked as a restaurant chef). Courts have found that whether deemed illiterate or of a "limited education," claimants with backgrounds like Plaintiff's can perform unskilled work at Language Level 1. *See Ruiz*, 2020 WL 57197, at *2–3 (finding that claimant who completed eleventh grade in special education with limited reading and writing abilities could perform hand packager job); *Galarza*, 2019 WL 525291, at *15–17 (finding "illiterate" claimant employable because record evidenced some ability to read and write more than his name in English and he previously worked in jobs at Language Levels 1 and 2).[23]  The VE classified Plaintiff's babysitting job as 301.677-010 in the D.O.T., which requires a Language Level of 2. *301.677-010 Child Monitor*, Dictionary of Occupational Titles, 1991 WL 672652; (*see* R. 58).  Therefore, contrary to Plaintiff's assertions, the record "demonstrate[s] some facility with the English language" at Levels 1 *or* 2 – namely, at or even above the level to which Plaintiff objects – including an ability to read, follow instructions, and write more than her name in English. *See Galarza*, 2019 WL 525291, at *15–17.

Accordingly, regardless of the terminology used to describe Plaintiff's language skills, there is sufficient evidence on this record to support a finding that she could engage in the three jobs recommended by the VE.  Therefore, the Court finds that the ALJ's step five determination was supported by substantial evidence.

## III.  CONCLUSION

For the foregoing reasons, the Court respectfully recommends denying the Plaintiff's motion for judgment on the pleadings, and granting the Commissioner's cross-motion.

---

[23] *See also Ward v. Comm'r of Soc. Sec.*, No. 5:16-CV-1038 (GTSWBC), 2017 WL 7049561, at *7 (N.D.N.Y. Nov. 16, 2017), *report and recommendation adopted*, 2018 WL 546951 (N.D.N.Y. Jan. 16, 2018); *Graves v. Astrue*, No. 11-CV-6519 (MAT), 2012 WL 4754740, at *13 (W.D.N.Y. Oct. 4, 2012); *920.587-018 Hand Packager*, Dictionary of Occupational Titles, 1991 WL 687916.

## IV.  NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report and Recommendation to serve and file written objections. *See* Fed. R. Civ. P. 6(a) and (d) (rules for computing time).  A party may respond to another party's objections within fourteen (14) days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2).  Objections and responses to objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Cathy Seibel at the United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at said Courthouse.

Requests for extensions of time to file objections must be made to the Honorable Cathy Seibel and not to the undersigned.  Failure to file timely objections to this Report and Recommendation will result in a waiver of objections and will preclude later appellate review of any order of judgment that will be rendered. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b), 6(d), 72(b); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008).

Dated:   February 9, 2021
       White Plains, New York

**SO ORDERED:**

*Judith C. McCarthy*

JUDITH C. McCARTHY
United States Magistrate Judge
